## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FIRST QUALITY TISSUE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-428-RGA |
| | ) | |
| IRVING CONSUMER PRODUCTS LIMITED and IRVING CONSUMER PRODUCTS, INC., | ) ) ) | **PUBLIC VERSION** |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND SPECIAL MASTER ORDER #3

Before the Special Master are eight discovery-related disputes between Plaintiff First

Quality Tissue, LLC (First Quality) and Defendants Irving Consumer Products Limited and

Irving Consumer Products, Inc. (together, Irving).  The table below lists the eight disputes and

the movant for each.

| DISPUTES | MOVANT |
|---|---|
| 1.  First Quality's assertion of privilege over measurements, measurement protocols, and related materials withheld by First Quality and Mahr and Digital Metrology | Irving |
| 2.  Irving's subpoenas for documents from Amster and Amster attorneys | Irving |
| 3.  Motion to compel documents and interrogatory responses relating to measurements and protocols | Irving |
| 4.  Motion for protective order regarding the deposition of Irving CEO Robert Irving | Irving |
| 5.  Motion for protective order regarding the deposition of First Quality CEO Kambiz Damaghi | First Quality |
| 6.  Motion to strike and for sanction regarding Irving's supplemental invalidity contentions and new initial disclosures served 8/28/2020 and second supplemental invalidity contentions served 9/3/2020 | First Quality |
| 7.  Motion to compel Albany documents | First Quality |
| 8.  First Quality's objection to disclosing First Quality confidential information to Irving's expert, Dale Kavalew | First Quality |

Each party filed a motion on the docket for the disputes where it is the movant (D.I. 126 and 127).  The parties submitted briefing on each of these disputes, and the Special Master held a transcribed videoconference hearing on September 18, 2020.

At the September 18, 2020 videoconference hearing, the Special Master ruled on disputes 3, 4, 5, and 7.  For those disputes, the hearing transcript shall serve as the Special Master's Order.  This Memorandum Opinion and Order addresses the remainder of the disputes.

I.    **Dispute 1:  First Quality's assertion of privilege over measurements, measurement protocols, and related materials withheld by First Quality, Mahr, and Digital Metrology**

A.  **Background**

First Quality asserts three related patents, U.S. Patent Nos. 9,506,203, 9,580,827, and 9.725,853.  All three are entitled "Soft Through Air Dried Tissue."  And all three claim priority to the same August 2012 provisional application and March 2013 non-provisional application. The patents issued between November 2016 and August 2017.  The asserted claims require that the outer surface of the through air dried (TAD) tissue has specific surface properties.  These properties include "Average Peak to Valley Waviness," "Waviness Uniformity," "Average Primary Amplitude," and "Amplitude Uniformity."  Of these, Pa (Average Primary Amplitude) and Wc (Average Peak to Valley Waviness) are the focus of this motion.

The specifications of the patents, which appear to be the same, state that "the tissue of the present invention is measured to have Pa and Wc values that are both low and relatively uniform compared to conventional TAD tissue products."  *See, e.g.,* '203 patent at 9:24-26.  The patents disclose measured values of Pa and Wc for several prior art tissues and two embodiments of the invention.  *Id*. at column 9.  These measurements were taken using Mahr, Inc's profilometer and analyzed using Digital Metrology Solutions, Inc.'s Omnisurf software.  *Id*. at column 9.

2

Irving requested First Quality's Pa and Wc measurements and protocols for obtaining those measurements.  Ex. D to Irving's Opening Brief at 80-81 and 87-88.  Irving also requested the same measurement documents from Mahr and Digital Metrology.  Exs. E and F to Irving's Opening Brief.  The parties do not dispute that the requested documents are relevant.

First Quality produced some documents regarding the measurements disclosed in the patents.  Tr. 27-29.  But First Quality, Mahr, and Digital Metrology withheld the majority of documents concerning Pa and Wc measurements based on claims of attorney-client privilege and attorney work product, and each served a privilege log.  Exs. K, L, and M to Irving's Opening Brief.

Irving moves to compel production of measurements of the properties claimed or described in the asserted patents, protocols for obtaining those measurements, and samples of prior art products from First Quality and its third-party vendors Mahr Inc. and Digital Metrology.  First Quality voluntarily submitted 23 documents for *in camera* inspection.  As Irving notes, First Quality chose these documents unilaterally; they were not selected randomly.

## B.  Legal Standards Governing Attorney-Client Privilege and Attorney Work Product

The attorney-client privilege gives the client the "right to refuse to disclose confidential communications between attorney and client made for the purpose of obtaining legal advice." *Hoffmann–La Roche, Inc. v. Roxane Labs., Inc.*, No. 09–6335 (WJM), 2011 WL 1792791, at *4 (D.N.J. May 11, 2011) (internal citation omitted).  The privilege "encourage[s] full and frank" information exchanges within the attorney-client relationship to promote the observation of law and the administration of justice.  *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991).  While the privilege protects communications between privileged persons, it does not protect the facts

underlying those communications.  *Brigham and Women's Hosp. Inc. v. Teva Pharms. USA, Inc.*, 707 F. Supp. 2d 463, 469 (D. Del. 2010) (citing *Upjohn*, 449 U.S. at 395).

The United States Court of Appeals for the Third Circuit has held that the attorney-client privilege applies to "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client."  *In re Chevron Corp.*, 650 F.3d 276, 289 (3d Cir. 2011). "'Privileged persons' include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (citation omitted).

The attorney work product doctrine is different from and broader than the attorney-client privilege.  *INVISTA N. Am. S.a.r.l. v. M&G USA Corp.*, No. 11-1007, 2013 WL 12171721, at *4 (D. Del. June 25, 2013).  Attorney work product protection shields documents "prepared by or on behalf of attorneys in anticipation of litigation."  *Westinghouse*, 951 F.2d at 428; Fed. R. Civ. P. 26(b)(3).

Attorney work product is not discoverable absent a showing of substantial need, undue hardship, or inability to obtain their equivalent by other means.  Fed. R. Civ. P. 26(b)(3).  Even if such a showing is made, Rule 26(b)(3) requires courts to protect from disclosure "the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."  The party asserting the work product doctrine bears the burden of demonstrating that the documents at issue were prepared by or for counsel in preparation for trial or in anticipation of litigation.  *WebXchange Inc. v. Dell Inc.*, 264 F.R.D. 123, 128 (D. Del. 2010).

4

### C.  Discussion

Irving first argues that the descriptions in the privilege logs fail to describe the withheld materials "in a manner that, without revealing the information itself privileged or protected, will enable other parties to assess the claim."  Fed. R. Civ. P. 26(b)(5)(A).  Irving contends that the logs use five generic descriptions that fail to establish that the documents are privileged or protected.  First Quality counters that the level of detail provided in the logs is "standard fare."  According to First Quality, the entries are sufficient when read in conjunction with the consulting agreements between counsel and Mahr and Dr. Malburg and considered with the context provided in a declaration from First Quality's head of product development, James Sealy.

Although the log entries are on the less detailed end of the spectrum, they do not violate Rule 26 because they provide enough information to assess the claims, especially when considered along with the Sealy declaration.  Irving waited until its reply brief to explain why First Quality's descriptions allegedly are insufficient.  Those arguments should have been raised in Irving's opening brief.  D. Del. Civil Local Rule 7.1.3 ("The party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief.").  In any event, Irving's arguments are unvailing.  Irving argues that "First Quality failed to identify a specific author for nearly all entries on its own log and thousands of DM log entries."  Irving's Reply Brief at 3.  Upon review, this is not the case.  Almost all log entries identify an author.  Entries without an author listed appear to be attachments to emails where the author of the email is identified.  Irving also argues that many entries do not identify an attorney.  "A document need not be authored or addressed to an attorney in order to be properly withheld on attorney-client privilege grounds." *SmithKline Beecham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 477 (E.D. Pa. 2005) (citing *Santrade, Ltd. v. Gen. Elec. Co.*, 150 F.R.D. 539, 545 (E.D.N.C.

1993)).  In any event, most of the entries cited by Irving identify a First Quality consultant like Mahr or Dr. Malburg, who were working at the direction of First Quality's attorneys.  Thus, First Quality's log entries provide sufficient information to evaluate its privilege claims.  *See id*. at 482-83.  Even if the detail in the log entries had been lacking, Irving has not shown that any deficiencies justify wholesale production of the logged documents.  Irving's motion to compel based on the level of detail in the logs is **DENIED**.

Irving moves to compel prior art tissue samples withheld by First Quality, Mahr, or Digital Metrology.  The prior art samples themselves are not protectable as work product or under the attorney-client privilege and should be produced for inspection.  *See In re Teleglobe Communications Corp.*, 493 F.3d 345, 361 (3d Cir. 2007).  Even if the samples were somehow construed to be attorney work product, Irving should have access to them because it has a substantial need for prior art samples and there is no way for Irving to obtain their substantial equivalent by other means.  *See* Fed. R. Civ. P. 26(d)(3)(A).  Irving's motion to compel production of any prior art tissue samples for inspection is **GRANTED**.

Irving next challenges whether First Quality had any proper basis to withhold the logged documents as attorney-client privileged or attorney work product.  The documents withheld by First Quality fall into three categories (*see* First Quality's Answering Brief at 3-4):

(1) Testing and analysis conducted by Dr. Malburg of Digital Metrology and Mahr at the direction of First Quality's attorneys at Amster Rothstein & Ebenstein LLP to understand the methodologies described in third-party patents, and interpretation of data for Amster to use in its legal analysis and advice.

(2) Projects with Amster related to obtaining patent protection on soft bath tissue products in 2013 and on towel products in 2015.

(3) Testing that raised concerns about infringement by First Quality's competitors with respect to recently filed patent applications.

Each category is discussed in turn below.

6

### i.  Category (1)

Documents in category (1) concern testing and analysis related to third-party patents, not the patents asserted in this case.  As the Sealy declaration points out, the Amster firm issued a right-to-use opinion to First Quality concerning these third-party patents.

Category (1) documents are "opinion letters and background memoranda with respect to the scope and validity of patents and patent applications," and thus are subject to work product immunity.  *Hercules,* 434 F. Supp. at 151 (internal citations omitted).  The involvement of non-testifying, third-party consultants Digital Metrology and Mahr does not change the result.  *See* D.I. 67 at 9 (finding that testing performed in the context of this litigation by consulting experts is work product).  The Special Master's review of the documents from this category submitted for *in camera* review confirms Mr. Sealy's testimony.  Thus, the documents in category (1) are protectable as attorney work product.  For these reasons, Irving's motion to compel production of the category (1) documents is **DENIED**.

Because attorney work product protection is broader than the attorney-client privilege, *INVISTA,* 2013 WL 12171721, at *4, and attorney work product protection applies to all documents in category (1), analyzing the application of the attorney-client privilege to the category (1) documents is unnecessary.

### ii.  Category (2)

Category (2), according to First Quality, includes "analysis and interpretation of various data" pursuant to Dr. Malberg's consulting agreement that "was sent to and used by Amster for purposes of providing legal advice regarding patent prosecution."  First Quality's Answering Brief at 4.  Presumably, "various data" includes Pa and Wc measurements of prior art tissue samples.  First Quality claims that category (2) documents are attorney-client privileged but

makes no claim for attorney work product protection. *See* First Quality's Answering Brief at 11-12.

Irving argues that the Pa and Wc measurements, protocols for obtaining them, and samples that were measured are not protected by the attorney-client privilege because they are facts. Irving is correct that "[w]hile communications between the attorney and the client are protected by the privilege, the facts underlying those communications are not." *Brigham & Women's Hosp.*, 707 F. Supp. 2d at 469. Parsing communication from fact, however, often creates "some difficult line-drawing problems." *Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 145 (D. Del. 1977). The *Hercules* decision pointed out that "[t]he fact that a communication contains technical information, however, does not automatically preclude application of the privilege. If the primary purpose of the document is to solicit legal advice based on that information, the privilege applies." *Id*. at 148.

Because drawing lines can be problematic when determining privilege in patent matters, courts often examine challenged documents *in camera* before making a decision. *See, e.g., id.*; *Shire Dev. Inc. v. Cadila Healthcare Ltd.,* No. CA 10-581-KAJ, 2012 WL 5247315, at *4 (D. Del. June 15, 2012). In *Shire*, Special Master Joshua W. Martin III reviewed each challenged document *in camera*, found that certain documents and certain portions of documents contained "purely technical or factual information," and ordered those documents and portions of documents to be produced. *Shire*, 2012 WL 5247315, at *4-8.

Here, First Quality cites to no decision holding that purely technical or factual information is protected by the attorney-client privilege. The closest First Quality comes is *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 806 (Fed. Cir. 2000). *In re Spalding* held that a specific invention record containing technical information was attorney-client privileged where

8

the "overall tenor of the document indicates that it is a request for legal advice or services." *Id*. But "*Spalding* does not insulate otherwise discoverable information simply because it is included in a privileged communication." *Vasudevan Software, Inc. v. International Business Machines Corp.*, 2011 WL 1599646, *2–*3 (N.D. Cal. 2011).

To the extent that Pa and Wc measurements and protocols for obtaining them are purely technical or factual, they are not protected by the attorney-client privilege. Of the documents submitted for *in camera* inspection, at least ECA0001907181 and ECA0001907191 appear to be from category (2). Both of these documents contain charts with purely technical or factual information. Given First Quality's statement at the hearing that many of the withheld documents are "data" (Tr. 38:6-10), additional documents in category (2) likely contain purely technical or factual information.

To complete the record and perform the needed case-by-case determination, First Quality shall submit all category (2) documents for *in camera* review. When submitting the documents for review, First Quality will provide to the Special Master new versions of the three privilege logs with the rows for the documents being submitted highlighted in yellow and a column with a Bates or other control number for each document being submitted for review so the Special Master can determine which document corresponds with which log entry. After reviewing the category (2) documents, the Special Master will rule on what documents or portions of documents shall be produced.[1]

---

[1] Irving raised a waiver argument regarding First Quality's disclosure of some but not all Pa and Wc measurements of prior art in the specifications of the asserted patents. "The waiver exception has been narrowly construed." *Hercules*, 434 F. Supp. at 156. Irving cites no decision applying waiver of either attorney-client privilege or attorney work product protection in a similar context. The Special Master declines to extend the waiver exception to this context.

### iii.  Category (3)

Category (3), according to First Quality, contains "documents, communications, and technical reports related to assessment of infringement of First Quality's intellectual property." First Quality's Answering Brief at 10.  First Quality withheld these documents as both attorney-client privileged and attorney work product.

Irving argues that because all of the documents withheld are dated long before this suit was filed in March 2019, they could not have been prepared in anticipation of litigation.  As Irving correctly notes, no asserted patent issued before November 29, 2016, yet most of the entries in First Quality's logs are dated earlier than 2016.

Although Irving's argument has some initial appeal, the particular facts at issue here show that litigation was anticipated as early as May 8, 2013.  Anticipation of litigation is not limited to a particular amount of time prior to filing suit.  Rather, "[t]he test to be applied is whether, in light of the nature of the documents and the factual situation in this particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Hercules*, 434 F. Supp. at 151.  As *Hercules* noted:

> a responsible patent attorney always anticipates the possibility of future litigation involving the patent.  It is possible that, during the ex parte prosecution, certain memoranda or recordings, etc. prepared by the attorney may reflect concerns more relevant to future litigation than to the ongoing prosecution.  If the primary concern of the attorney is with claims which would potentially arise in future litigation, the work product immunity applies; if the attorney's primary concern is claims which have arisen or will arise during the ex parte prosecution of the application, however, the work product rule does not apply.

*Id*. at 152.

The declaration of James E. Sealy, the director of product development at First Quality, states that "around May 20, 2013, First Quality conducted testing that raised concerns about

infringement by First Quality's competitors with respect to First Quality's recently filed patents." Sealy Declaration ¶ 10.  The documents submitted for *in camera* review support Mr. Sealy's testimony.  In fact, the documents show that the testing began earlier, on May 8, 2013.

In light of these facts, the record shows that the category (3) documents primarily concern future litigation rather than the ongoing prosecution of the asserted patents.  Thus, they are protected attorney work product.[2]  *See Reckitt Benckiser LLC v. Amneal Pharm., LLC,* No. CIV.A. 11-6609 FLW, 2012 WL 2871061, at *6 (D.N.J. July 12, 2012); *Lambeth Magnetic Structures, LLC v. Seagate Tech. (US) Holdings, Inc.*, No. 16-538, 2018 WL 466045, at *4-5 (W.D. Pa. Dec. 19, 2017).  For these reasons, Irving's motion to compel production of the category (3) documents is **DENIED**.

## II.     Dispute 2:  Irving's subpoenas for documents from Amster and Amster attorneys[3]

### A.  Background

Amster Rothstein & Ebenstein LLP represented First Quality during the prosecution of the asserted patents.  Irving served document and deposition subpoenas on the Amster firm and two individual prosecuting attorneys at the Amster firm (together, "Amster").  Amster served written objections.  Irving's Opening Brief at Ex. O.  Fish & Richardson P.C., counsel for First Quality in this litigation, also represents Amster with respect to Irving's subpoenas.  Irving agreed to narrow the scope of its document subpoenas to "the contents of the prosecution files leading to the asserted patents (App. Nos. App. Nos. App. Nos. 61/679,337, 13/837,685, 14/534,631, 15/170,746, and 15/443,885) other than those documents filed with the USPTO,

---

[2] Because attorney work product protection is broader than the attorney-client privilege, *INVISTA,* 2013 WL 12171721, at *4, and attorney work product protection applies to all documents in category (3), analyzing the application of the attorney-client privilege to the category (3) documents is unnecessary.

[3] The parties and Amster, through their counsel, agreed that the Special Master has authority to decide this dispute.

including measurements of the properties recited in the asserted claims, protocols for obtaining

such measurements, and pre-March 15, 2013 bath or facial tissue product samples." Irving's

Opening Brief at 8. Irving confirmed at the hearing that it is not currently moving to compel the

deposition of Amster. Tr. 44:7-23.

### B. Discussion

The prosecution files for the asserted patents—which are now the only documents

sought—are clearly relevant. Amster and First Quality do not appear to argue otherwise. But

Amster objects to the document subpoenas because: (1) they are overbroad and unduly

burdensome; (2) many of the documents sought are available from First Quality or non-attorney

third parties; (3) there is no requirement that a third party provide a detailed privilege log; and

(4) the majority of the documents sought are privileged or work product.

Amster's undue burden argument fails because it is unsupported. Under Rule 45, a

subpoena recipient may object on the basis that compliance with the subpoena would be an

undue burden. Fed. R. Civ. P. 45(d)(3)(A)(iv). But Amster's counsel admitted that he had not

reviewed the five prosecution files sought by Irving and thus did not know the volume of

documents involved or the contents of the documents. Tr. 42:9-44:4. Amster cannot credibly

argue undue burden without knowing the volume of documents sought.

Amster's argument that many of the documents sought are available elsewhere might

hold up if Amster was a typical third party. But Amster is not a typical third party. Amster

represented First Quality, the plaintiff, during prosecution of the asserted patents. Amster is

being represented here by the same firm representing First Quality. Arguably, the prosecution

files sought here are under the control of First Quality and should have been collected by First

Quality. Fed. R. Civ. P. 34 (a party may serve discovery on another party seeking documents in

the other party's "possession, custody, or control"). Further, because Amster's counsel has not

yet reviewed the documents, the record is unclear as to the extent of any overlap between documents sought from Amster and those produced by First Quality or others.  Under these facts, the possible availability of similar documents from other sources carries little weight.

Amster's objection that the majority of the documents sought are privileged is also suspect given that counsel has not reviewed the requested files and does not know their contents. The preparation of a log is contemplated by Fed. R. Civ. P. 45(e)(2)(A) ("[a] person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must: … describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.").  Amster has not provided a basis to find that preparation of a log would be an undue burden here.

There is a fair chance, however, that many of the prosecuting attorneys' files are privileged.  To reduce the burden on Amster, I encourage the parties to meet and confer about the use of a categorical log rather than logging each document individually.  Fed. R. Civ. P. 26, Notes of Advisory Committee on Rules—1993 Amendment ("The rule does not attempt to define for each case what information must be provided when a party asserts a claim of privilege or work product protection.  Details concerning time, persons, general subject matter, etc., may be appropriate if only a few items are withheld, but may be unduly burdensome when voluminous documents are claimed to be privileged or protected, particularly if the items can be described by categories.").  *See also* The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production, 19 Sedona Conf. J. 1, 82 (2018) ("A categorical log may provide sufficient information for the requesting

party (and perhaps the court or a third party) to assess the validity of the privilege claims asserted as to each category of documents").

### C.  Conclusion on Dispute 2

Irving's motion to compel related to Amster is **GRANTED-IN-PART and DENIED-IN-PART**.  Within ten (10) calendar days, Amster shall produce any portions of "the contents of the prosecution files leading to the asserted patents (App. Nos. App. Nos. 61/679,337, 13/837,685, 14/534,631, 15/170,746, and 15/443,885) other than those documents filed with the USPTO, including measurements of the properties recited in the asserted claims, protocols for obtaining such measurements, and pre-March 15, 2013 bath or facial tissue product samples" that are not attorney-client privileged or attorney work product.  Amster's attorney-client privilege and attorney work product determinations shall be consistent with the Special Master's discussion on Dispute 1, above.  If Amster withholds any documents under a claim of attorney-client privilege or attorney work product, Amster shall produce a log with its production.  This log shall comply with the requirements of Rules 26 and 45.  The parties shall meet and confer about Amster's use of a categorical log or other log type that avoids logging each document individually.

### III.  Dispute 6:  First Quality's Motion to strike and for sanctions regarding Irving's supplemental invalidity contentions and new initial disclosures served 8/28/2020 and second supplemental invalidity contentions served 9/3/2020

#### A.  Background

On February 24, 2020, Irving served Initial Invalidity Contentions that identified four prior art references and alleged anticipation under 35 U.S.C. § 102(b).  Only one of the four references was a "through air dried" (TAD) tissue.  At the *Markman* claim construction hearing, Irving argued that the term "through air dried" in the preamble of each asserted claim was not entitled to patentable weight.  D.I. 79.  If the TAD preamble has no patentable weight, then the

three non-TAD prior art references would anticipate, according to Irving.  *Id*.  On July 8, 2020, the Court issued a claim construction opinion that sided with First Quality and found the TAD preamble was limiting.  D.I. 83 at 3.

The Court's claim construction threw a wrench into Irving's invalidity contentions. Irving had identified only one TAD prior art reference.  Irving claims that it then acquired and measured other samples of TAD Proctor & Gamble's Puffs and Charmin products and identified some printed prior art references.  Irving's Sept. 11, 2020 Brief at 5.  The evidence supplied by Irving indicates that at least one newly identified prior art tissue was ordered from an eBay seller on August 12, 2020, a little over a month after the Court's claim construction opinion.  Ex. DD.

On August 28, 2020, Irving served supplemental invalidity contentions identifying the new prior art it had located and tested.  In addition to anticipation, Irving also added obviousness positions and more detail to its § 112 and unenforceability positions.  The same day, Irving supplemented its initial disclosures to name two third-party witnesses relevant to the prior art in its supplemental invalidity contentions.

On September 3, 2020, Irving again supplemented its invalidity contentions, this time only adding additional measurement data on the previously disclosed prior art samples.

Fact depositions in this case began on September 9, 2020.  Ex. HH.

First Quality moves to strike Irving's supplemental invalidity contentions and initial disclosures and for sanctions under Rules 37 and 16(f).

### B.  Discussion

 Rule 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

To determine whether a failure to disclose is harmless, courts in the Third Circuit consider the "*Pennypack*" factors, which include: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an orderly and efficient trial; (4) the presence of bad faith or willfulness in failing to disclose the evidence; and (5) the importance of the information withheld. *See Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904-05 (3d Cir. 1977)).  The determination of whether to exclude evidence is within the discretion of the court.  *See In re Paoli*, 35 F.3d 717, 749 (3d Cir. 1994).

Irving does not dispute that its supplemental invalidity contentions and identification of prior art witnesses disclosed new information and new positions.  Nor could it.  Instead, Irving argues that striking its new contentions would be an extreme sanction and Irving's disclosures are harmless under the *Pennypack* factors.

Irving correctly notes that "[c]ourts in the Third Circuit favor resolution of disputes on their merits, particularly with respect to patent validity issues, which raise public interest concerns extending beyond the immediate dispute between the parties."  *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 93 (D. Del. 2016).  Further, excluding critical evidence like invalidity contentions is an "extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence." *Abbott Labs. v. Lupin Ltd.,* 2011 WL 1897322, at *3 (D. Del. May 19, 2011) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994)).

Here, there is no evidence that Irving has been willfully deceptive or flagrantly disregarded a court order.  To the contrary, it appears that Irving moved with reasonable

diligence in supplementing its invalidity contentions after it obtained and tested new prior art samples. Also, Irving violated no court order with its supplemental contentions—there was no deadline in the scheduling order for final invalidity contentions. This favors denying First Quality's motion to strike.

Even if Irving's supplemental contentions had been untimely, analysis of the five *Pennypack* factors also favors denying First Quality's motion.

*Factor 1: Surprise or Prejudice.* First Quality should not be surprised that Irving supplemented its invalidity contentions following claim construction but well before the close of fact discovery, especially where the supplementation occurred before any depositions had been taken. And the nature of Irving's supplementation—additional TAD prior art—is not surprising given the Court's decision that the TAD preamble is limiting.

The timing of the supplementation minimizes any prejudice. First Quality has had the opportunity to depose the newly disclosed witnesses and take discovery on the newly disclosed prior art. First Quality's expert(s) will have the opportunity to opine on Irving's new invalidity theories.

First Quality cites no decision from this District striking invalidity contentions made before the close of fact discovery and before any depositions. Irving, however, cited decisions denying motions to strike when fact discovery provided an opportunity to cure any prejudice. *See, e.g., WebXchange Inc. v. FedEx Corp.*, No. 08-133-JJF, 2010 WL 299240, at *3 (D. Del. Jan. 20, 2010).

Factor 1 favors denying First Quality's motion to strike.

*Factors 2 and 3: The possibility of curing the prejudice and potential disruption of an orderly and efficient trial.* As just discussed, First Quality had ample opportunity to cure any

17

possible prejudice during fact discovery, and did so.  Trial is almost a year away.  D.I. 103.

There is no reason to think that Irving's new invalidity theories will affect the trial date, or any

other case deadlines.  Thus, factors 2 and 3 favor denying First Quality's motion to strike.

Factor 4:  *Bad faith or willfulness*.  There is no evidence that Irving acted in bad faith or

willfully chose not to disclose its new invalidity theories and prior art witnesses earlier.  As

explained above, Irving acted diligently and adequately explained the timing of its actions.

Factor 4 favors denying First Quality's motion to strike.

Factor 5:  *Importance of the information withheld*.  In light of the Court's construction of

the TAD preamble, Irving's supplemental invalidity contentions and new prior art witnesses are

critically important.  *See EMC*, 154 F. Supp. 3d at 93.  First Quality argues that because the new

contentions are merely "supplemental," they may reasonably be stricken.  First Quality's

Opening Brief at 15-16.  But First Quality's reply brief paints a different picture:  "Irving's new

contentions … neither narrow nor supplement its existing contentions."  First Quality's Reply

Brief at 2.  First Quality cannot have it both ways.  Irving supplemental contentions include

important new prior art, and therefore Factor 5 favors denying First Quality's motion to strike.

### C.  Conclusion on Dispute 6

First Quality's motion to strike and for sanctions regarding Irving's supplemental

invalidity contentions and new initial disclosures served 8/28/2020 and second supplemental

invalidity contentions served 9/3/2020 is **DENIED**.

## IV.    Dispute 8:  First Quality's Objection to Irving's Expert, Dale Kavalew

### A.  Background

First Quality argues that because Irving's proposed technical expert, Dale Kavalew, a

Procter & Gamble retiree, currently serves as a "consultant to organizations in the Pulp and

Paper Industry for consumer products and paper-making cost savings as well as expertise in

tissue paper making and fiber physics and functionality," (First Quality's Opening Brief at 18 (quoting Ex. 16, Kavalew CV)), and since he has sought patent protection in the same subject matter as the asserted patents, he should not be allowed access to First Quality's confidential information. *Id.* at 20. Irving argues First Quality falls short of its burden in objecting to Mr. Kavalew because it points to "no specific, concrete present harm but instead speculates about Mr. Kavalew's possible future work and presumes he will violate his obligations under the Protective Order." Irving's Answering Brief at 17.

## B. Discussion

Although courts have "inherent power" to disqualify expert witnesses, doing so is "a drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004). Courts consider the extent of the expert's involvement with the receiving party's business, present involvement in competitive decision-making, including advice related to research, the potential for future involvement, and the feasibility of separating the knowledge gained. *Biovail Labs. Int'l SRL v. Abrika, LLLP*, No. 04-61704, 2007 WL 788849, at *2 (S.D. Fla. Mar. 14, 2007); *see also Ares-Serono, Inc. v. Organon Int'l B.V.*, 153 F.R.D. 4, 6 (D. Mass. 1993) (finding former employee who had "considerable" past involvement with receiving party but "minimal" present involvement was "properly characterized as an independent expert"); *Streck, Inc. v. Research & Diagnostic Sys., Inc.*, 250 F.R.D. 426, 433 (D. Neb. 2008) (finding no evidence that expert would be "unable to separate any information he gains in this case from his present employment" and thus "no appreciable risk of inadvertent disclosure which would result in an unfair competitive disadvantage").

Where the court is called upon to determine whether confidential information should be disclosed, it must "exercise its sound discretion to implement the philosophy of full disclosure of relevant information during discovery, while at the same time affording the parties reasonable protection against harmful side effects." *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, No. 81-508, 1982 WL 63780, at *1 (D. Del. May 17, 1982). As such, an expert's agreement to be bound by the terms of a protective order and submit to the jurisdiction of the court for enforcement purposes favors allowing disclosure of confidential information. *See, e.g.*, *RR Donnelly & Sons Co. v. Xerox Corp.*, No. 12-cv-6198, 2013 WL 6696652, *2 (N.D. Ill. Dec. 19, 2013) ("[A]s a consultant, it would seem that [the proposed expert] has a vested interest in ensuring that he is able to maintain the integrity of his representations. Indeed, if he cannot be trusted to honor those agreements, if he disclosed confidential information—whether deliberately or inadvertently—he would likely never be able to serve as a consultant again.").

The parties' Stipulated Protective Order in this case contemplates that material designated Confidential or Highly Confidential may be disclosed to "[o]utside experts, whether testifying or not, retained in this action, and their necessary support personnel," subject to certain procedures. D.I. 31 at 6-8. Confidential or Highly Confidential information "shall be held in confidence by each person to whom it is disclosed, shall be used only for purposes of this litigation, shall not be used for any other purpose, including business purposes, and shall not be disclosed to any person who is not entitled to receive it." *Id.* at 8. The Order is clear that such information "shall not be used in any proceeding" including in front of the USPTO without written consent of the designating party. *Id.* Even information that is "derived from" Confidential or Highly Confidential information is afforded the same protections. *Id.* Before receiving Confidential or Highly Confidential information, a party's expert must execute Exhibit

20

A to the Order, which requires the expert to agree to be bound by the Order's terms, to submit to the jurisdiction of the Court, to expressly understand that failure to abide by the terms might constitute contempt, and further to agree to return or destroy all Confidential and Highly Confidential material at the conclusion of the matter.  *Id.* at 17-18.

In light of these terms, when challenging disclosure to an expert through the process outlined in the Order, "[t]he party seeking to prevent disclosure of the 'Confidential' or 'Highly Confidential' information and things to an individual shall have the burden to prove to the Court that such disclosure is inappropriate."  *Id.* at 10.

First Quality has not met its burden.  Although Mr. Kavalew may be a current consultant in the industry with experience and knowledge about the subject matter at issue, such a background is, to a certain extent, a prerequisite for participation in this litigation and not grounds for disqualification.  Because First Quality has not demonstrated that Mr. Kavalew is involved in the competitive decision making process for Irving, or for any other identifiable First Quality competitor, there is not an articulated injury supporting the relief First Quality seeks.  Irving's interest in sharing information with its technical testifying expert, necessary in order to meaningfully present its defenses, outweighs any risk.

### C.  Conclusion on Dispute 8

First Quality's motion to prevent Mr. Kavalew from accessing First Quality's confidential information under the Protective Order is **DENIED**.

\*       \*       \*

21

This memorandum opinion and order is preliminarily submitted under seal as a precaution because various portions of the underlying briefing were marked highly confidential. Within three (3) business days of this order, the parties shall jointly email the Special Master and advise of any proposed redactions.

IT IS SO ORDERED.

Dated: October 2, 2020

_____

Special Master Chad S.C. Stover

22