IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FIRST QUALITY TISSUE, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 19-428-RGA |
| ) | |
| IRVING CONSUMER PRODUCTS ) | **PUBLIC VERSION** |
| LIMITED and IRVING CONSUMER ) | |
| PRODUCTS, INC., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND SPECIAL MASTER ORDER #13

Defendants Irving Consumer Products Limited and Irving Consumer Products, Inc. (together, "Irving") move to strike (1) the copying opinions of First Quality's technical expert, Dr. Runge, in the "Other Opinions" section of his opening expert report and (2) evidence supporting damages disclosed for the first time in the opening report of First Quality's damages expert, Dr. Maness.  In the alternative, Irving requests the opportunity to take additional discovery.  The parties fully briefed these issues, and I held a transcribed hearing on December 10, 2020.  After the hearing, at my direction, the parties conferred about ways to cure the alleged prejudice from a particular paragraph of Dr. Runge's copying opinions and provided an email summary of this conference to me on December 14, 2020.

For the reasons explained below, Irving's motion is **DENIED-IN-PART** and **GRANTED-IN-PART** as to the copying opinions and **DENIED** as to the evidence supporting damages.

### BACKGROUND

I have decided many discovery disputes in this case.  *See, e.g.,* Special Master Order Nos. 3 (D.I. 138), 5 (D.I. 143), 7 (D.I. 148), and 8 (D.I. 149).  My prior decisions provide context for

the present dispute.  In Special Master Order #3, I denied First Quality's motion to strike Irving's supplemental invalidity contentions and new initial disclosures.  In Special Master Order #8, I allowed Irving to proceed with the deposition of a third party well after the close of fact discovery, and I denied First Quality's motion to strike Irving's third and fourth supplemental invalidity contentions, which Irving had served a month after the close of fact discovery.  In that opinion, I noted that "[e]xcluding this critical evidence would be an 'extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence.' *Abbott Labs. v. Lupin Ltd.*, 2011 WL  1897322, at *3 (D. Del. May 19, 2011) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 791-92 (3d Cir. 1994))."  D.I. 149 at 5-6.

It is also worth noting that: (1) both sides produced thousands of documents during the final month of fact discovery; (2) the parties took all depositions near (or after) the fact discovery deadline; and (3) the parties produced at least some portions of their privilege logs after the fact discovery deadline.

Now Irving brings a motion to strike portions of First Quality's recently served expert reports because of First Quality's alleged failure to timely supplement contention interrogatory responses on copying and damages.

**First Quality's Copying Disclosures and Dr. Runge's Report**

During fact discovery, Irving's Interrogatory No. 9 asked First Quality to identify "all facts, circumstances, documents, and things" supporting any contention of willful infringement.  Irving's Nov. 20, 2020 Opening Brief ("Opening Brief"), Ex. A at 2.  First Quality responded: "Irving was well aware of First Quality's patents, including the asserted patents, and had communications regarding First Quality's intellectual property, as well as how to copy the

technology claimed in First Quality's patents." *Id*. at Ex. C, pages 22-23. Related to copying, First Quality further responded: "Albany employee Jeff Herman informed First Quality employee James Sealey that Mr. Herman had discussed First Quality's patent materials with Irving employees because they were having problems meeting product specifications for bath tissue required by Sam's Club." *Id*. First Quality also objected to the extent the request sought expert opinions before the appropriate deadlines, noted that Irving's document production was not complete, and reserved the right to supplement. *Id*.

After the close of fact discovery, Dr. Runge timely served an opening expert report. *Id*. at Ex. H. Dr. Runge opined that Irving's study and reverse engineering of First Quality's technology went "well beyond industry norms in product development, and demonstrates copying of First Quality's product." *Id*. at Ex. H, ¶ 18. In a section of his report entitled "Other Opinions," Dr. Runge opined: "Irving's stated goal of matching First Quality's levels on temporary wet strength demonstrates a high degree of deliberate copying, because it is a very specific aspect of tissue production." *Id*. at Ex. H, ¶ 78. Dr. Runge went on to state many other reasons for his conclusion that Irving went beyond industry norms in its product development. Dr. Runge did not mention, however, anything about the communications between Mr. Herman and Mr. Sealey described in First Quality's interrogatory response.

**First Quality's Damages Disclosures and Dr. Maness's Report**

Irving's Interrogatory No. 21 requested "the complete basis for Plaintiff's damages claims." Opening Brief, Ex. F at 2. First Quality's response said it was seeking damages under 35 U.S.C. § 284 and that it "expects to rely upon financial and market data to be produced by Irving in this case." *Id*. at Ex. G, pages 10-11. First Quality's response cited to no evidence. As

3

with Interrogatory No. 9, First Quality also objected to Interrogatory No. 21 as prematurely seeking expert opinion evidence.

On November 6, 2020, First Quality timely served Dr. Maness's opening expert report on damages.  Opening Brief, Ex. I.  Irving characterizes the report as containing 187 footnotes, "many of which cite documents that were used as deposition exhibits for First Quality's and Irving's witnesses."  Opening Brief at 6.  None of the documents cited in Dr. Maness's footnotes were listed in First Quality's response to Interrogatory No. 21.

## DISCUSSION

### I.  Legal Standards

Rule 37(c)(1) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

To determine whether a failure to disclose is harmless, courts in the Third Circuit consider the "*Pennypack*" factors, which include: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an orderly and efficient trial; (4) the presence of bad faith or willfulness in failing to disclose the evidence; and (5) the importance of the information withheld.  *See Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904-05 (3d Cir. 1977)).  The determination of whether to exclude evidence is within the discretion of the court.  *See In re Paoli*, 35 F.3d 717, 749 (3d Cir. 1994).

**II.      First Quality's Timely Service of Its Expert Reports is Not Dispositive**

First Quality argues that Rule 26 requires a disclosure of an expert's opinions in the expert's written report, "not ahead of time." First Quality's Dec. 4, 2020 Opposition Brief ("Opposition Brief") at 8. First Quality also argues that "it will generally not be possible to identify an expert's opinion on any matter until an expert has had a chance to review the record and formulate an opinion." Opposition Brief at 9. First Quality posits that Irving's complaints should fall of deaf ears because Drs. Runge and Maness served their opening reports on the deadline for such reports.

This argument misses the mark because it attempts to ignore First Quality's responsibility to provide responses to contention interrogatories during fact discovery and Rule 37(c)(1)'s admonition that a party who fails to provide information when required to do so cannot later use that information. The question is not whether First Quality's experts timely served opening expert reports—they clearly did. The question is whether First Quality provided adequate contention interrogatory responses and timely supplemented those responses.

**III.     Irving's Motion to Strike Dr. Runge's Copying Opinions or for Discovery**

Although First Quality mentioned copying in response to Irving's Interrogatory No. 9 asking for willful infringement contentions, the copying theory recited in its interrogatory response is different from the theory recited by its expert, Dr. Runge. Irving argues that First Quality should have disclosed its new theory during fact discovery, presumably early enough for Irving to have pursued discovery on it. I agree. Complete disclosure of a party's contentions during fact discovery is the preferred practice, and, in theory, should happen in every case.

Unfortunately, this case, like many others, confirms that "reality is the murder of a beautiful theory by a gang of ugly facts."[1]  Both sides delayed much of their document production and all of their depositions until the end of the fact discovery period.  This made it difficult, if not impossible, for the parties to update contention interrogatory responses during the fact discovery period.  Given these facts, I cannot say that First Quality failed to supplement its contention interrogatory responses in a timely manner.  And even if First Quality delayed somewhat, its delay was substantially justified.  *See* Fed. R. Civ. P. 37(c)(1).

Also, both sides could have been better about supplementing contention interrogatory responses.  As First Quality points out, in his opening report, Irving's invalidity expert witness cited testing results from a third-party lab that arguably should have been cited in Irving's interrogatory responses.  Opposition Brief at 5-6.  Further, I have repeatedly allowed Irving to supplement its invalidity contentions, including after the close of fact discovery.  *See* D.I. 149.

The fact remains that First Quality identified a new copying theory after the close of fact discovery and Irving lacked the opportunity to pursue discovery on this new theory.  I find there is at least some prejudice to Irving, albeit curable prejudice.

First Quality argues there is no prejudice to cure.  In fact, after the hearing, First Quality offered to strike the paragraph of Dr. Runge's report mentioning temporary wet strength and represented that "Dr. Runge did not offer and will not offer an opinion comparing Irving's manufacturing process to First Quality's manufacturing process."  Dec. 14, 2020 email.  According to First Quality, Irving turned down this offer.  While I appreciate First Quality's attempt to compromise, I am not convinced that striking this one paragraph would fully cure the alleged prejudice because the temporary wet strength issue could be relevant to Dr. Runge's

---

[1] This quote has been attributed to both Herbert Spencer and Benjamin Franklin.

6

other opinions. For example, if Irving can establish that it did not copy First Quality's temporary wet strength, this could undermine Dr. Runge's overall opinion that Irving went beyond normal industry practices in studying and reverse engineering First Quality's technology.

First Quality also argues that Irving took at least some discovery on First Quality's manufacture of its Sam's Club product, which is the discovery Irving now claims to need. While true, I see no evidence that Irving ever took discovery on the temporary wet strength levels of First Quality's Sam's Club product or had any reason to take such discovery until Dr. Runge issued his report.

The question becomes what additional discovery is needed to cure the prejudice to Irving. I directed the parties to confer on this issue, hoping they could work out an agreeable solution. They could not. Irving lists the discovery it purports to need. *See* Opening Brief at 10 and Dec. 14, 2020 email. Irving's list is long and expanded significantly between the briefing and the parties' conference after the hearing. Irving wants all documents about how First Quality makes its Sam's Club product and depositions from multiple witnesses. But Irving's chief complaint and the focus of its briefing was the issue of temporary wet strength. Thus, I believe that a two-hour deposition of the person most knowledgeable about how First Quality achieved its temporary wet strength levels in its Sam's Club product should more than cure any prejudice. I have considered the other items on Irving's list and find them unnecessary to cure any prejudice.[2]

Because First Quality's delay was substantially justified, analysis of the *Pennypack* factors is unnecessary. Even if First Quality's delay had not been justified, however, the delay was harmless under the *Pennypack* factors.

---

[2] Irving also requested its fees and costs incurred in pursuing this additional discovery. I deny that request.

In considering the *Pennypack* factors, I recognize that courts should decide disputes on their merits to the extent possible.  *See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 93 (D. Del. 2016).  I also recognize that courts have been "less indulgent" in applying the *Pennypack* factors, where, as here, the litigation is complex and a party is represented by "competent counsel."  *Bridgestone Sports Co. v. Acushnet Co.*, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007).

*Factor 1:  Surprise or prejudice*.  While First Quality had not previously disclosed some of Dr. Runge's copying theories, the documents he cited were produced during fact discovery and Irving attended the depositions he cited.  Indeed, most of the information about Irving's product development was, not surprisingly, in Irving's possession.[3]  Thus, I find this factor neutral.

*Factors 2 and 3:  The possibility of curing the prejudice and potential disruption of trial*.  Irving admits that any prejudice is curable.  There remains ample time before trial (and indeed before the close of expert discovery) for Irving to take the two-hour deposition needed to cure any prejudice.  Thus, these factors weigh heavily against exclusion.

*Factor 4:  Bad faith or willfulness*.  There is no evidence of bad faith here, especially considering that both sides produced many documents, including some of the documents on which Dr. Runge relies, shortly before the close of fact discovery.  The fact that Irving repeatedly supplemented its invalidity contentions near the end of fact discovery (and after) does not alter this conclusion.  If anything, Irving's repeated, material supplementations likely gave

---

[3] First Quality argues that it was somehow limited in its ability to cite Irving's highly confidential product development documents and testimony in a contention interrogatory response because First Quality must verify the response.  First Quality cites no authority to support this proposition, and I am aware of none.  Infringement contentions and damages contentions, for instance, routinely require citation to the other side's highly confidential information.

First Quality less time to focus on updating its own contentions.  This factor weighs against exclusion.

*Factor 5:  Importance of the information withheld*.  Dr. Runge's copying opinion is at least somewhat important.  Irving makes a fair point that First Quality can present much of the evidence Dr. Runge cites through cross-examination of Irving's witnesses.  But First Quality correctly notes that Irving would not have bothered to move to strike an unimportant opinion.  On balance, I find this factor neutral.

Weighing the factors, I find that the ability to cure any prejudice within the current schedule is largely dispositive.  The lack of any bad faith further supports my conclusion that Dr. Runge's reliance on a new copying theory is harmless under the *Pennypack* factors and should not be excluded.

## IV.     Irving's Motion to Strike Evidence Supporting Dr. Maness's Damages Opinions

First Quality's damages contention interrogatory response disclosed that First Quality intended to rely on Irving's financial and market data to support it reasonably royalty damages calculation.  But First Quality's interrogatory response did not identify any of the evidence or documents cited by Dr. Maness in his opening damages report.

My analysis of Dr. Maness's damages opinions in light of First Quality's damages contention interrogatory response is similar to my analysis above.  As was the case with Interrogatory No. 9, I cannot say that First Quality failed to supplement its damages contention interrogatory response in a timely manner.  And even if First Quality delayed, its delay was substantially justified under the circumstances.

I also find that any delay in disclosure of First Quality's damages opinions and supporting evidence is harmless under the *Pennypack* factors.  Irving knew First Quality's

9

damages interrogatory response cited no evidence. Irving knew First Quality's damages expert would rely on *some* evidence to support his reasonable royalty opinions. So Irving cannot argue it was surprised by Dr. Maness's citations. On prejudice, Irving admits that "[i]t is difficult to define this prejudice with precision." Opening Brief at 14. Irving did not define prejudice with any particularity. Arguing that Irving would have more thoroughly probed the documents cited by Dr. Maness is insufficient. Even if there is some limited prejudice from not knowing First Quality's full damages theories during fact discovery, this is at least partially a situation of Irving's own creation. Irving waited until the end of discovery to produce many of its documents. And Irving chose not to move to compel a more detailed response to Interrogatory No. 21.

Because Irving has not defined prejudice with any specificity, *Pennypack* factors 2 and 3 relating to curing the prejudice and potential disruption of an efficient trial do not favor exclusion. If there is any prejudice, Irving has the opportunity to cure it in its rebuttal expert report.

There is no evidence of bad faith or willfulness (factor 4), and the importance of the information withheld to First Quality's damages case (factor 5) is self-evident. Further, Irving cites no case where a court limited a damages expert witness to only the documents listed in a damages contention interrogatory response, and I am aware of no such decision. I thus find that all of the *Pennypack* factors weigh against striking Dr. Maness's opinions that rely on evidence other than financial and market data produced by Irving.

## CONCLUSION

For the reasons stated above, Irving's motion to strike the copying opinions in Dr. Runge's opening expert report is **DENIED-IN-PART** and **GRANTED-IN-PART.** Irving's

motion to strike the allegedly new copying opinions in the report is denied. But I grant-in-part the portion of the motion seeking additional discovery to cure the alleged prejudice. First Quality shall produce the person most knowledgeable about how First Quality achieved its temporary wet strength levels in its Sam's Club product for a remote deposition of no more than two hours. The deposition questioning shall focus on how First Quality achieved its temporary wet strength levels in the Sam's Club product. The parties shall confer about the timing of this deposition, which shall take place as soon as possible. Irving's motion to strike reliance on certain evidence supporting Dr. Maness's damages opinions is **DENIED**.

I submit this memorandum opinion and order under seal as a precaution because the underlying briefing was marked highly confidential. Within three (3) business days of this order, the parties shall jointly email me and advise of any proposed redactions.

IT IS SO ORDERED.

Dated: December 17, 2020

                                                      Special Master Chad S.C. Stover