IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FIRST QUALITY TISSUE, LLC, | ) | **REDACTED PUBLIC VERSION** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 19-428-RGA |
| | ) | |
| IRVING CONSUMER PRODUCTS | ) | |
| LIMITED and IRVING CONSUMER | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS IRVING CONSUMER PRODUCTS LTD. AND IRVING
CONSUMER PRODUCTS, INC.'S OPENING BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND
TO EXCLUDE EXPERT TESTIMONY**

*Of Counsel:*

Maximilian A. Grant
Matthew J. Moore
Inge A. Osman
Rebecca L. Rabenstein
Jeremiah A. Egger
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

Charles H. Sanders
David W. Rowe
Paul Weinand
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Dated:  March 19, 2021

ASHBY & GEDDES
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants*

{01671913;v1 }

# TABLE OF CONTENTS[1]

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................................1

II.   SUMMARY OF ARGUMENT .........................................................................................1

III.  STATEMENT OF FACTS .................................................................................................3

    A.  The Asserted Patents..................................................................................................3

        1.  Facts Relevant To Indefiniteness ...................................................................3

        2.  Facts Relevant To Lack of Written Description ..........................................5

    B.  The Expert Opinions At Issue ..................................................................................6

        1.  Drs. Runge's And Maness's Copying "Opinions" .....................................6

        2.  Dr. Maness's Damages Opinion ....................................................................7

IV.   LEGAL STANDARDS ......................................................................................................7

    A.  Summary Judgment ...................................................................................................7

    B.  Indefiniteness .............................................................................................................8

    C.  Written Description.....................................................................................................8

    D.  Expert Testimony.......................................................................................................9

V.    ARGUMENT ....................................................................................................................10

    A.  The Court Should Grant Summary Judgment of Invalidity.................................10

        1.  The Asserted Claims Are Indefinite ...........................................................10

        2.  The Asserted Claims Lack Written Description Support .........................22

    B.  Improper Expert Testimony On Copying and Damages Should Be
        Excluded ..................................................................................................................27

        1.  FQ's Experts' Copying Opinions Should Be Excluded............................27

        2.  The Court Should Exclude Dr. Maness's Damages Opinion ...................31

VI.   CONCLUSION..................................................................................................................40

---

[1] All emphases added and internal quotation marks and citations omitted unless otherwise noted.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
No. 1:16-cv-00453-RGA, 2019 WL 4194060 (D. Del. Sept. 4, 2019)...................................37

*Alarm.com, Inc. v. SecureNet Techs. LLC*,
No. 15-807-RGA, 2019 WL 133228 (D. Del. Jan. 8, 2019).............................................27, 29

*Am. Seating Co. v. USSC Grp., Inc.*,
514 F.3d 1262 (Fed. Cir. 2008).........................................................................38, 39, 40

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc).......................................................2, 9, 22, 25, 26

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)..............................................................................3, 32, 33

*AstraZeneca LP v. Tap Pharm. Prod., Inc.*,
444 F. Supp. 2d 278 (D. Del. 2006).........................................................................28, 31

*Bioverativ Inc. v. CSL Behring LLC*,
No. 17-cv-914-RGA, 2020 WL 1047755 (D. Del. Mar. 4, 2020) ...........................................39

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)...............................................................................36

*D Three Enters., LLC v. SunModo Corp.*,
890 F.3d 1042 (Fed. Cir. 2018)..................................................................................9

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*,
803 F.3d 620 (Fed. Cir. 2015)............................................1, 8, 10, 13, 15, 16, 17, 19, 21, 22

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
909 F.3d 398 (Fed. Cir. 2018)..............................................................................32, 33

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014).............................................................................3, 36, 37

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)...............................................................................37, 38

*Honeywell Int'l, Inc. v. ITC*,
341 F.3d 1332 (Fed. Cir. 2003)......................................................................13, 19, 20, 21

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*,
    761 F.2d 649 (Fed. Cir. 1985)...............................................................................35

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)...........................................................................38, 39

*Liqwd, Inc. v. L'Oréal USA, Inc.*,
    No. 17-14-JFB-SRF, 2019 WL 8014103 (D. Del. Jun. 25, 2019)..........................30

*Lockwood v. Am. Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997).............................................................................24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120, 572 U.S. 898 (2014)............................................................8, 10, 22

*Novozymes A/S v. DuPont Nutrition Biosciences APS*,
    723 F.3d 1336 (Fed. Cir. 2013)..................................................................23, 24, 26

*Pac. Coast Bldg. Prods., Inc. v. Certainteed Gypsum, Inc.*,
    816 F. App'x 454 (Fed. Cir. 2020) .........................................................8, 13, 15, 21

*PowerOasis, Inc. v. T- Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)...............................................................................9

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) (en banc).......................................................3, 4, 35

*Rivera v. ITC*,
    857 F.3d 1315 (Fed. Cir. 2017).......................................................................25, 26

*Saso Golf, Inc. v. Nike, Inc.*,
    No. 2020-1456, 2021 WL 486578 (Fed. Cir. Feb. 10, 2021) .............................8, 17

*Schneider ex rel. Estate of Schneider v. Fried*,
    320 F.3d 396 (3d Cir. 2003).....................................................9, 10, 27, 28, 29, 30, 40

*Sonos, Inc. v. D & M Holdings, Inc.*,
    297 F. Supp. 3d 501 (D. Del. 2017).................................................2, 27, 28, 31

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
    789 F.3d 1335 (Fed. Cir. 2015)...................................................................8, 13, 21

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011).............................................................................30

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...................................................................3, 33, 34

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004)...................................................................................26

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
  782 F.3d 671 (Fed. Cir. 2015)......................................................................................9

*VirnetX, Inc. v Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014)..............................................................33, 34, 36, 38

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  778 F.3d 1365 (Fed. Cir. 2015)...................................................................................40

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019)....................................................................27, 28

**Statutes**

35 U.S.C. § 284................................................................................................3, 33, 35

**Other Authorities**

Fed. R. Civ. P. 56...............................................................................................................8

Fed. R. Evid. 702............................................................................................................2, 9

## I.     NATURE AND STAGE OF PROCEEDINGS

Plaintiff First Quality Tissue, LLC ("FQ") asserts three patents sharing a common specification against defendants Irving Consumer Products Limited and Irving Consumer Products, Inc. (collectively, "Irving"):  U.S. Patent Nos. 9,506,203 ("the '203 patent," D.I. 81-1), 9,580,872, ("the '872 patent," D.I. 81-2), and 9,752,853 ("the '853 patent," D.I. 81-3).[2]  The Court construed the disputed terms (D.I. 83, 85), and both fact and expert discovery concluded (D.I. 103, 155).  As the Court ordered (D.I. 187), FQ now asserts ten claims—claims 1 and 3 of the '203 patent; claims 1, 3-4, and 8 of the '872 patent; and claims 4, 10, and 12-13 of the '853 patent.

## II.    SUMMARY OF ARGUMENT

The Court should grant summary judgment that all asserted claims are invalid for indefiniteness, lack of written description, or both.

1.     The asserted claims are indefinite because there are multiple ways to measure the claimed values (Average Peak to Valley Waviness (Wc) and Average Primary Amplitude (Pa)), unrebutted evidence shows that those different ways can materially affect the results, and the patents fail to provide any guidance on which way to use.  *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 631-35 (Fed. Cir. 2015) (claims indefinite because intrinsic record did not specify which of multiple methods to use, and those methods led to different results).  In particular, whether the Wc and Pa measurements are taken over embossed or non-embossed portions of the tissue can have a very significant impact on the results.  And the patents fail to describe (i) how to account for embossing, (ii) where to perform the measurements, (iii) whether to measure one sample or ten samples, and (iv) what version of "OmniSurf software" to use to calculate the results.

2.     The asserted claims lack written description support because the patents fail to

---

[2] Since the patents have an identical specification, all citations are to the '203 patent (D.I. 81-1).

"reasonably convey[] to those skilled in the art that the inventor[s] had possession of the claimed subject matter." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  The patents disclose a single tissue having Wc and Pa within the claimed ranges, Example 5.  '203 pat., Tables 2-3.  Some asserted claims require Wc (and in many cases Pa) and "bulk softness of less than 10TS7," hand-feel "softness of at least 90," or "caliper of less than 650 microns."  *Id.*, cls. 1 & 3; '872 pat., cl. 4; '853 pat., cls. 4, 12 & 13.  But the patents disclose *no* tissue having the claimed Wc (and Pa) plus any of those other properties.  Separately, the disclosure of one example having Wc and Pa within the claimed ranges fails to "reasonably convey[]" that the inventors possessed the far broader ranges they claimed.  *Ariad*, 598 F.3d at 1351.

* * * * *

If the Court does not grant summary judgment that all asserted claims are invalid, then the Court should preclude FQ's technical expert, Dr. Runge, and FQ's damages expert, Dr. Maness, from opining that Irving copied FQ's product and patents.  For distinct reasons, the Court also should exclude Dr. Maness's damages opinion.

3.      The Court should exclude Drs. Runge's and Maness's copying opinions because "[t]he jury would not be aided by expert testimony" on alleged copying.  *Sonos, Inc. v. D & M Holdings, Inc.*, 297 F. Supp. 3d 501, 521-22 (D. Del. 2017) (excluding expert opinion on copying) (Bryson, J., sitting by designation); *see also* Fed. R. Evid. 702.  FQ should be limited to presenting evidence on this topic through fact witnesses, without "invoking the special imprimatur that accompanies … presentation by an expert."  *Sonos*, 297 F. Supp. 3d at 522.

4.      The Court should exclude Dr. Maness's damages opinion because he committed five legal errors.  First, in refusing to adjust the royalty base to exclude any non-infringing products, Dr. Maness violated the principle that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute infringement, as patent damages are limited to those

'adequate to compensate for the infringement.'"  *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) (quoting 35 U.S.C. § 284).  Second, he erroneously applied a rule of thumb, pegging his royalty rate to Irving's lowest annual profit margin for sales of the accused bathroom tissue (i.e., toilet paper).  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (holding "the 25 percent rule of thumb … fundamentally flawed").  Third, Dr. Maness's rule of thumb amounts to disgorgement of Irving's profits, but disgorgement is not an available form of damages, and he does not even contend that FQ is entitled to lost profits.  35 U.S.C. § 284. Fourth, in attributing Irving's entire profits to the asserted patents, Dr. Maness apportioned no value to unpatented features of the accused tissue to ensure that his royalty reflects "the approximate incremental benefit derived from" FQ's alleged invention.  *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014).  Fifth, his royalty is based in part on his opinion that *paper towel* are convoyed sales, but those paper towel sales are not convoyed sales as a matter of law because paper towels have "essentially no functional relationship to the" accused bathroom tissue.  *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995) (en banc).

## III.   STATEMENT OF FACTS

### A.   <u>The Asserted Patents</u>

#### 1.   Facts Relevant To Indefiniteness

The asserted claims require four main surface roughness characteristics: Average Peak to Valley Waviness (Wc), Waviness (Wc) Uniformity, Average Primary Amplitude (Pa), and Amplitude (Pa) Uniformity.  Specifically, all asserted claims require an "Average Peak to Valley Waviness [Wc] of 140 or less."  '203 pat., cls. 1 & 3; '872 pat., cls. 1, 3, 4 & 8; '853 pat., cls. 4,

10, 12 & 13.[3]  All asserted claims except claim 4 of the '853 patent require "Waviness Uniformity of 27 microns or less."  Claims 1, 3-4, and 8 of the '872 patent and claims 10 and 12-13 of the '853 patent require "an Average Primary Amplitude [Pa] of 50 microns or less and an Amplitude Uniformity of 8 microns or less."

The patents include a section on "Pa and Wc Testing."  '203 pat., 9:28-59.  The Court construed "Average Peak to Valley Waviness" (Wc) and "Average Primary Amplitude" (Pa) as quantities measured according to the procedure in this section.  D.I. 85.  This section begins by stating that "[t]en samples of each tissue to be tested were prepared, with each sample being a 10 cm by 10 cm strip," and each sample was placed into a Marsurf profilometer.  '203 pat., 9:28-59.  The patents state that the Wc and Pa measurements are performed by running "[t]wenty scans … per sample (ten in the forwards direction and ten in the backwards direction)," with "[e]ach scan cover[ing] a 30 mm length."  *Id.*  But the patents do not explain where the scans are performed, whether those scans are performed over the same line or different lines, or how to account for embossed areas on the tissue's outer surface.  The measurement data is processed using an unspecified version of "Omnisurf software" to calculate Wc and Pa values.  *Id.*

The section on "Pa and Wc Testing," however, concludes by explaining more specifically that "[t]he calculated values of Pa and Wc for all twenty scans," i.e., a single sample, "were averaged to obtain Pa and Wc values for each tissue sample," and "[t]he standard deviation of the individual sample Pa and Wc values were also calculated."  *Id.*  There is no disclosure of averaging Pa, Wc, and standard deviations of Pa and Wc, across ten samples.

"Table 2 shows the Pa and Pa standard deviation for commercial products," and "Table 3

---

[3] Asserted claims 10 and 12-13 of the '853 patent depend on non-asserted independent claim 8. Claim 10 of the '853 patent slightly narrows the claimed range of "Average Peak to Valley Waviness" from "140 microns or less" to "135 microns or less."

shows the Wc and Wc standard deviation of several commercial products." *Id.* 10:5-59.  But the patents do not describe the number of samples tested. ███████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████       Keller Dec. ¶89.

## 2. Facts Relevant To Lack of Written Description

The patents claim priority to an August 2012 provisional application.  '203 pat., Cover. The provisional application contains most of the content of the patents' specification through column 9, line 12.  D.I. 81-11, 5-22.  That disclosure includes statements that "tissue has a bulk softness of less than 10 TS7" in an "exemplary embodiment," "softness (hand feel) of at least 90," and "caliper of less than 650 microns."  D.I. 81-11, 8 (¶¶15-16), 17 (¶¶56, 58); '203 pat., 2:22-25, 6:59-63, 7:11-13.  The provisional application included the patents' Table 1, which shows Comparative Example 1 and Examples 1-4 having hand-feel softness above 90.  D.I. 81-11, 21; '203 pat., Table 1.  The provisional application, however, omitted any disclosure of Wc or Pa.  The specification's disclosure of Wc and Pa, which starts at column 9, line 13, was added in the non-provisional application filed in March 2013.  D.I. 81-12, 43-48 (¶¶84-100).

The non-provisional application that led to the asserted patents, filed on March 15, 2013, added disclosure that "the roughness of tissue can be characterized using two values, Pa (Average Primary Amplitude) and Wc (Average Pack to Valley Waviness)" and defined their standard deviations as "Amplitude Uniformity" and "Waviness Uniformity," respectively.  D.I. 81-12, 43 (¶84), 46 (¶97); '203 pat., 9:16-18, 10:63-11:4.  The new disclosure also included the section on "Pa and Wc Testing" discussed above.  D.I. 81-12,  43 (¶¶85-87); '203 pat., 9:28-59.

The non-provisional application also added new Tables 2 and 3, and a new example, Example 5, composed of "[t]wo plies, with each ply being equivalent to … Example 1," "embossed

together to form a finished tissue." D.I. 81-12, 44 (¶¶91-92); '203 pat., 9:61-67.  Example 5 is the

sole disclosed example of allegedly "inventive tissue" that has Wc, Wc Uniformity, Pa, or Pa

Uniformity in the claimed ranges.  '203 pat., 10:5-63.[4]  The patents do not disclose the TS7 bulk

softness, hand-feel softness, or caliper of Example 5.  As a result, the patents do not disclose any

tissue having the claimed Wc, Wc Uniformity, Pa, or Pa Uniformity *and* any particular TS7 bulk

softness, hand-feel softness, or caliper.  But many asserted claims require the claimed Wc and Pa

values *and* "bulk softness of less than 10TS7" ('203 pat., cls. 1 & 3; '872 pat., cl. 4), hand-feel

"softness of at least 90" ('853 pat., cl. 12), or "caliper of less than 650 microns" ('853 pat., cl. 13).

Further, the patents' only disclosure of Pa and Wc values of an allegedly inventive tissue within

the claimed ranges are the single values of Pa and Wc for Example 5 in Tables 2 and 3.

## B.    The Expert Opinions At Issue

### 1.    Drs. Runge's And Maness's Copying "Opinions"

Dr. Runge opines that



demonstrates copying of First Quality's product." Ex. 1 (Runge Op.) ¶18.  In stating

the basis for this opinion, he asserts,

Dr. Maness likewise states that

and confirmed at his deposition that,

while he relies heavily on Dr. Runge, he is also offering his own opinion (Ex. 15 (Maness Tr.)

---

[4] The patents incorrectly state, "Tables 1 and 2 show the improved surface roughness characteristics" ('203 pat., 10:60-64); that statement should refer to Tables 2 and 3.

94:19-96:1).

### 2.   Dr. Maness's Damages Opinion

Dr. Maness concludes that FQ should receive a "reasonable royalty from Irving's use of … the invention." Ex. 13 (Maness Op.) ¶11.  He offers no opinion on lost profits.  Ex. 15 (Maness Tr.) 16:7-10.  Dr. Maness contends that "the royalty base is all Irving's bathroom tissue sales to Sam's Club for the Member's Mark product" and that this royalty base "would not change" even "if some of the Irving Member's Mark product does not infringe." *Id.* 50:1-5, 86:23-87:8.  Thus, his "computation of damages in this case would not change even if some of that Irving's Member's Mark bath tissue product did not infringe." *Id.* 89:6-15.

Dr. Maness pegs his "reasonable royalty ███████████" to Irving's lowest annual profit margin on sales of its accused bathroom tissue, which was ███████████ Ex. 14 (Maness Reply) ¶¶27, 31.  In reaching this royalty rate, his "opinion that Irving's paper towel sales to Sam's Club are convoyed sales" was "a factor that figured into [his] analysis under the *Georgia-Pacific* factors." Ex. 15 (Maness Tr.) 106:3-19.  He concluded "the presence of significant convoyed sales from the sale of paper towels provides a benefit to Irving and a cost of licensing to First Quality that confers additional bargaining power to First Quality." *Id.* 106:20-25; *see also* Ex. 13 (Maness Op.) ¶105.  Indeed, Dr. Maness opined that, because "paper towel sales are properly considered convoyed sales," those sales "would significantly increase Irving's maximum willingness to pay, even above the total profits from the sale of TAD BRT alone." *Id.* ¶92.

## IV.   LEGAL STANDARDS

### A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   A non-moving party must support that a fact is genuinely disputed by either "citing

to particular parts of materials in the record" or "showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

### B.  Indefiniteness

"[A] patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). Otherwise, companies would face a "zone of uncertainty" that would deter commercial activity because of "the risk of infringement claims." *Id.* 35 U.S.C. § 112, ¶2, thus "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.*

Under *Nautilus*, when the claim requires a measurement, the claim is indefinite when there are multiple ways to perform the measurement, and the intrinsic record does not describe which one to use. *Dow*, 803 F.3d at 630 ("where multiple known approaches exist," a person having ordinary skill (POSA) in the art must "know which approach to select"); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1344-45 (Fed. Cir. 2015) (claims indefinite because "molecular weight can be ascertained by any of three possible measures: $M_p$, $M_n$, and $M_w$," and "[t]he specification never defines molecular weight or even mentions $M_p$, $M_w$, or $M_n$"); *see also Pac. Coast Bldg. Prods., Inc. v. Certainteed Gypsum, Inc.*, 816 F. App'x 454, 458 (Fed. Cir. 2020) (The Federal Circuit "ha[s] previously found claims indefinite where the claim requires a specific measurement or calculation, more than one measurement method may be used and no guidance has been provided."); *Saso Golf, Inc. v. Nike, Inc.,* No. 2020-1456, 2021 WL 486578, at *4 (Fed. Cir. Feb. 10, 2021) (similar). "Indefiniteness is a question of law[.]" *Teva*, 789 F.3d at 1341.

### C.  Written Description

The written description requirement demands that the specification "clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad*, 598

F.3d at 1351 (alteration in original). "In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.* The written description inquiry is a question of fact, *id.*, but "[c]ompliance with the written description requirement ... is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T- Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008) (affirming summary judgment due to lack of written description); *see also D Three Enters., LLC v. SunModo Corp.*, 890 F.3d 1042, 1047 (Fed. Cir. 2018) (same). "A party must prove invalidity for lack of written description by clear and convincing evidence." *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015).

> **D.     Expert Testimony**

An expert may testify "if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "The Supreme Court explained in *Daubert* that 'Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591-92 (1993)). "[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Id.*

## V.     ARGUMENT

### A.     The Court Should Grant Summary Judgment of Invalidity

#### 1.     The Asserted Claims Are Indefinite

The asserted claims are indefinite because there are multiple ways to measure Average Peak to Valley Waviness (Wc), Waviness (Wc) Uniformity, Average Primary Amplitude (Pa), and Amplitude (Pa) Uniformity on embossed tissue, and the specification does not provide any guidance as to which way to use.   The patents, for example, fail to describe (1) how to account for embossing when measuring Wc and Pa, (2) where to perform the twenty scans required to measure Wc and Pa on embossed tissue, (3) how many samples to test, and (4) which software version to use for the required calculations.   And Irving's technical expert's, Dr. Keller's, unrebutted testing shows that these decisions can materially impact whether an embossed tissue satisfies the claims.   Keller Dec. ¶¶26-108.   Therefore, all asserted claims are indefinite because the patents' lack of guidance allows a POSA to obtain materially "different results," impermissibly creating a "zone of uncertainty" that the definiteness requirement forbids.   *Dow*, 803 F.3d at 634; *Nautilus*, 134 S. Ct. at 2129.

#### a.     The patents provide no guidance as to how to account for embossing

The patents specifically refer to measuring Wc and Pa on "embossed" tissue.   '203 pat., 9:65-67, Tables 2 & 3.   Embossing imprints a pattern onto tissue.   Keller Dec. ¶¶35-40.   For example, many types of bath tissue are embossed with flower patterns or other designs, e.g., to join two plies of tissue together.   *Id.*   Embossing impacts the "surface topography of the tissue" because the imprint creates recessed and raised features.   *Id.* ¶38; *see also id.* ¶¶24-25, 56.

While the patents describe measuring Wc and Pa on embossed tissue ('203 pat., 9:65-67), there is no dispute that the patents do not describe how to account for embossing in testing Wc or

Pa.  Both sides' experts agree that "the patents and their file histories" provide "no indication anywhere that embossments will impact the surface profile testing described in the patents"—let alone how to account for the effects of embossing.  Ex. 2 (Runge Reb.) ¶446; *see also* Ex. 4 (Runge Tr.) 179:21-180:7; Ex. 8 (Brown Tr.) 119:10-22 ("the specific effects of embossing … [are] not addressed in the patent in terms of the measurements"); Keller Dec. ¶¶51-53.

The Irving and FQ tissues at issue have a petal pattern embossed on them.  Keller Dec. ¶¶39, 50, 58, 65, Ex. A.  Because of the embossed pattern, some parts of the outer surface are embossed and some parts are not.  *Id*.  There is no dispute that where the petals are embossed on the outer surface varies from sheet to sheet.  *Id.* ¶¶58, 63, 65, 70, Ex. A.  Even Dr. Runge admits that "[t]he positioning of an emboss pattern will shift on sheets of a tissue from sheet to sheet," which "is readily apparent … in the Member's Mark product."  Ex. 3 (Runge Reply) ¶19; *see also id.* ¶26 ("the positioning of an emboss pattern shifts across sheets of a roll"); Ex. 4 (Runge Tr.) 170:19-25 ("If I look at a[n] … embossing pattern, and I look at consecutive sheets, it will not be in the same position").  As a result, the middle of FQ's or Irving's tissue may be embossed on one sheet and not embossed on another sheet.  Keller Dec. ¶¶58, 70.

## b.    Unrebutted evidence establishes that embossing is material

Dr. Keller's unrebutted testing establishes that embossing can materially affect measurement of the claimed Wc and Pa values.  Dr. Keller tested to "assess whether scanning over embossing" affects Wc and Pa.  Keller Dec. ¶43.  In contrast, Dr. Runge did not "do any testing to evaluate whether embossments will affect the surface profile of the tissue" and "was not asked to … provide any opinions on that" issue.  Ex. 4 (Runge Tr.) 178:4-12.  FQ's other technical expert, Dr. Brown, similarly "did not observe any testing" to assess the effects of embossing and "was not asked to develop an opinion on how embossments might affect the properties … so [he] did not opine on that."  Ex. 8 (Brown Tr.) 119:2-8, 119:24-120:12.

Dr. Keller's unrebutted testing to assess the effect of embossing shows that whether Wc and Pa are measured in embossed or non-embossed regions can determine whether Wc and Pa values fall within the claimed ranges.  To investigate the effect of embossing on Wc and Pa measurements, Dr. Keller tested FQ's Member's Mark bathroom tissue.  Keller Dec. ¶44.  His testing tracked the patents' description and FQ's representations.  *Id.*  Just like the testing FQ relies on for infringement, Dr. Keller's testing was performed on "ten samples" with the scan lines about "2 mm" apart.  *Id.* ¶106; *see also* Ex. 3 (Runge Reply) ¶18; Ex. 7 (Brown Reply) ¶23.  In "Test #1," each scan intersected, or crossed over, embossing, while in "Test #2," each scan did *not* intersect or cross over embossing.  Keller Dec. ¶¶45-46.  As summarized below, Dr. Keller's unrebutted testing shows that embossing has a material impact on Wc and Pa.  *Id.* ¶50.  Compared to non-embossed regions, in embossed regions Wc was 71% higher, Wc's Uniformity was 197% higher, Pa was 60% higher, and its Uniformity was 184% higher.  *Id.*  In short, testing in embossed regions yielded values well outside the claimed ranges, while testing in non-embossed regions yielded values within the claimed ranges.  *Id.*

| FQ Members' Mark BRT | Average Peak to Valley Waviness (Wc) (claims: 140/135 microns or less) | Waviness Uniformity (claims: 27 microns or less) | Average Primary Amplitude (Pa) (claims: 50 microns or less) | Amplitude Uniformity (claims: 8 microns or less) |
|---|---|---|---|---|
| Test # 1 (emboss) | 214.0 µm ✗ | 52.6 µm ✗ | 67.5 µm ✗ | 11.1 µm ✗ |
| Test # 2 (no emboss) | 125.1 µm ✓ | 17.7 µm ✓ | 42.1 µm ✓ | 3.9 µm ✓ |

Because the intrinsic record undisputedly does not explain how to account for embossing, and whether the testing is performed in embossed versus non-embossed regions yields materially "different results," the claims are indefinite as a matter of law.  *Dow*, 803 F.3d at 634; *see also Teva*, 789 F.3d at 1341-45; *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1339-40 (Fed. Cir. 2003); *Pac. Coast*, 816 F. App'x at 458.

     **c.**     **The patents provide no guidance regarding where to perform the twenty scans to measure Wc and Pa on embossed tissue**

In the patents' section on "Pa and Wc testing," the patents describe that, to test Pa and Wc, "[t]wenty scans [a]re run on the profilometer per sample (ten in the forwards direction and ten in the backwards direction)." '203 pat., 9:28-59.   The patents also describe that each scan is 5 μm wide:  "a 5 μm tip was used for the profilometer."  *Id.*  And each scan is 30 mm long: "each scan covered a 30 mm length."  *Id.*  However, the patents and their prosecution histories do not disclose (1) where to perform those scans on the "10 cm by 10 cm" sample, (2) whether the sample is physically moved between scans to test different lines, and, (3) if the sample is moved between scans, how to position those scans relative to each other.  Keller Dec. ¶¶26, 29, 41, 51-53, 76-77, 84, 87.  The Court's constructions of Wc and Pa requiring measurement according to the patent's testing procedure (D.I. 85) thus do not provide the claims with definite scope because they likewise leave a POSA to make these choices without guidance in the intrinsic record.  *Honeywell*, 341 F.3d at 1339-40 (claims reciting "melting point elevation" (MPE) held indefinite, despite the specification's express definition of MPE, because the intrinsic record did not identify which of four possible sample preparation methods to use to measure MPE).  And all of these choices can materially affect whether Wc, Pa, and their uniformities for a given tissue falls within the claims because the POSA can choose whether to perform scans over embossing, not over embossing, or some combination thereof.  Keller Dec. ¶¶27, 41-43, 53, 55, 68, 76-77, 80-82, 84.

The patents never describe where to perform the twenty scans on the 10 cm by 10 cm piece of bath tissue.  The patent describes only that the scans are 5 μm wide and 30 mm long.  '203 patent, 9:33-43.  These scans, therefore, cover only a very small amount of the surface of a 10 cm by 10 cm piece of bath tissue, and there are many different ways a POSA could perform these scans.  Keller Dec. ¶¶31-33.  A POSA could, for example, try to avoid embossing, go over

embossing, or some of both, and each choice can materially impact Wc and Pa. *Id.* ¶¶50, 55, 68.

The patents also never describe whether the scans occur over one 5 μm by 30 mm line in the forward direction and a second line in the backward direction, or twenty different lines. Dr. Runge admits that "[t]here is no suggestion in the patents ... that the stylus testing ... should be done over the same line" and conversely that the patents "do not provide guidance to *not* run scans over the same line." Ex. 2 (Runge Reb.) ¶¶453-54. He nevertheless takes the conclusory, unsupported position "that each scan should be over a different line." *Id.* ¶453. But if the twenty scans are over twenty different lines, then the sample needs to be physically moved between scans (Keller Dec. ¶¶78, 86), but the patents never describe moving the sample. *Id.* ¶¶84-87. As a result, a POSA can perform all twenty scans over two lines—i.e., all ten forward scans over one line and all ten backward scans over a second line—or over twenty different lines. *Id.* And which approach a POSA chooses can materially impact the results because it can affect whether the line or lines went over embossing. *Id.* ¶¶50, 77, 79-83.

If a POSA chooses to scan over twenty different lines, the patents also fail to provide a POSA with any guidance as to how to position the twenty scans relative to each other. For example, the patents never describe whether scans should go over embossing, avoid embossing, or some combination thereof, which materially impacts the results. Keller Dec. ¶¶50, 53, 55, 68, 82. The patents also never describe whether the scans are spaced out across the tissue's surface or next to each other. If they are spaced out, how far are they spaced out? If they are next to each other, how close are they? Even Dr. Brown admitted "[t]here are different distances between scan locations that can be appropriate," and he does not opine on either the lower or upper limit on that distance. Ex. 8 (Brown Tr.) 99:4-13; *see also* Ex. 4 (Runge Tr.) 181:2-25 (POSA can select a "reasonable distance"). As a result, even if the scans are over twenty different lines, there are still

many different ways a POSA can perform these scans, and Dr. Keller's unrebutted testing shows that those different ways can materially impact Wc and Pa.  Keller Dec. ¶¶50, 53, 55, 68, 82.

      **d.**      **Despite the lack of guidance in the patents, FQ argues that a POSA would know where to scan embossed tissue**

FQ does not dispute that the patents do not describe where to perform the scans or how to account for embossing.  FQ argues only that a POSA would know where to perform these scans. Ex. 2 (Runge Reb.) ¶¶443-45, 453-54.  In response to Dr. Keller's opinion that the claims are indefinite, Dr. Runge contends that a POSA "would seek to use common sense approach for example choosing an appropriately common area (e.g., the middle of the sample sheet)" to test, suggesting that this will test "an appropriate portion" of embossments "over 10 sheets" because "varying amounts of the emboss pattern will appear in the center region of each sheet." *Id.* ¶445; Ex. 3 (Runge Reply) ¶19.  Dr. Runge's opinion does not save the claims.

Dr. Runge's opinion is just a conclusory, unsupported opinion.  Dr. Runge's does not cite the patent, the prosecution history or any other intrinsic or extrinsic evidence about measuring Wc and Pa to support his opinion that a POSA choose "an appropriately common area" to measure Wc or Pa.   As a result, it should be given no weight.  *Pac. Coast*, 816 F. App'x at 460 (rejecting conclusory expert opinion trying to fill in missing disclosure about which of multiple ways to test should be used).   And Dr. Runge's conclusory, unsupported opinion cannot save the claims because claims are indefinite where they leave a POSA "to consult the unpredictable vagaries of any one person's opinion." *Dow*, 803 F.3d at 635 (holding claims indefinite despite the patentee's expert's opinion that a POSA "could determine which method was the most appropriate").

Dr. Runge also does not state where to perform the scans.  He opines only that a POSA would choose "an appropriately common area" (whatever that means) and then gives an example "(e.g., the middle part of the sample sheet)." Ex. 2 (Runge Reb.) ¶445.  Dr. Runge does not require

performing the scans in the middle of the sheet, and he never explains how a POSA would identify the "appropriately common area" for embossed tissue.  *Id.*

Dr. Runge's opinion that a POSA would select "an appropriately common area," such as the "middle" of the sheet, to test across ten samples also conflicts with his (equivocal) opinion that a POSA may decide to avoid embossments—the positions of embossments vary from sheet to sheet.  Ex. 2 (Runge Reb.) ¶445; *see also id.* ¶451 ("it may be desirable to avoid embossments … but … embossments need not be avoided").  His opinion that "it may be desirable to avoid embossments" demonstrates the "unpredictable vagaries of any one person's opinion" that cannot save claims from indefiniteness.  *Id.* ¶451; *Dow*, 803 F.3d at 635.

Dr. Runge's opinion that a POSA would select "an appropriately common area" also conflicts with  choosing "an appropriately common area" to test cannot be common sense.  Ex. 2 (Runge Reb.) ¶445.  Further, while the patents fail to describe any impact of embossing in describing measurement of Wc and Pa on embossed tissue ('203 pat., 9:65-10:59), emphasize why expert opinion cannot substitute for guidance in the intrinsic record.  Rather, when, as here, "the required guidance is not provided by the claims, specification, and prosecution history," the claims are

indefinite.  *Dow*, 803 F.3d at 634; *see also Saso*, 2021 WL 486578, at *4-5 (claims indefinite where "calculations depended on pinpointing the locations of the toe and heel" but the intrinsic record provided "no guidance" to identify those locations).

While testing the middle of a tissue sheet is *an* option, the patent never describes testing the middle, and there are many other places to measure Wc and Pa as described above.  As Dr. Runge concedes, "Dr. Keller is correct that the patents are agnostic as to where exactly to run the scans."  Ex. 2 (Runge Reb.) ¶443.

Further, all of the asserted claims require "***an outer surface having*** an Average Peak to Valley Waviness [Wc] of 140 microns or less."  '203 pat., cls. 1 & 3; '872 pat., cls. 1, 3, 4 & 8; '853 pat., cls. 4, 10, 12 & 13.  But Dr. Runge's approach of testing twenty 5 μm by 30 mm lines spaced 2 mm apart in the middle of the tissue scans only a very small portion of the "outer surface"—about 0.03% percent—within a 2 cm by 3 cm area (i.e., 6%) of the sample's "10 cm by 10 cm" "outer surface."  Keller Dec. ¶¶31-32; '203 pat., 9:33-35.  And neither he nor the patents describe how scans of such a small area could represent the Wc or Pa for the "outer surface," when even a simple visual inspection shows that the topography of the outer surface varies due to embossing.  Keller Dec. ¶¶39, 58, 65, Ex. A.  Dr. Runge admits that "[t]he positioning of an emboss pattern will shift on sheets of a tissue from sheet to sheet" and cites no statistical analysis to show that the amount of embossing encountered in testing ten samples represents the proportion of the outer surface covered by embossing.  Ex. 3 (Runge Reply) ¶19; *see also* Keller Dec. ¶¶55, 69.

Dr. Runge's opinion—that testing the same area of ten samples will test "an appropriate portion" of embossing—is also incorrect because Dr. Runge assumes ten samples are tested.  Ex. 2 (Runge Reb.) ¶445.  But the patents are at best ambiguous about whether to test one sample or ten samples, as discussed below.

### e.   The patents are ambiguous about how many samples to test when measuring Wc and Pa

On one hand, the patents' "Pa and Wc Testing" section begins by stating that "[t]en samples of each tissue to be tested were prepared." '203 patent, 9:32-34.  On the other hand, the more detailed description of the test describes that Wc and Pa values are obtained by averaging twenty scans on one sample.  The patents state, "Twenty scans were run on the profilometer per sample …." *Id.*, 9:39-41.  And specifically, "[t]he calculated values of Pa and Wc for **all twenty scans were averaged to obtain Pa and Wc values** for each tissue sample," and "[t]he standard deviation **of the individual sample** Pa and Wc values were also calculated." *Id.* 9:51-57.  The patents do **not** mention averaging Pa, Wc, and their standard deviations across ten samples.  Thus, the patents are unclear about how many samples to test—one or ten.

Tables 2 and 3 show the Pa and Wc values for samples of "commercial products, Example 5, and Comparative Example 2." '203 pat., 10:5-59.  But there is no discussion of how many samples of those products were tested.  Dr. Runge even conceded that he could not tell how many samples were tested to obtain the data in Tables 2 and 3, and thus he had no opinion on how many samples were tested.  Ex. 4 (Runge Tr.) 182:3-183:5, 183:25-184:15.

Dr. Keller's unrebutted testing shows that whether testing is performed on one sample or ten samples can lead to materially different results.  Keller Dec. ¶¶50, 90.  If one sample of a tissue such as FQ's Members' Mark bathroom tissue is tested mainly in an embossed region, the Wc and Pa values will fall outside the claims, and if one sample is tested mainly in a non-embossed region, the Wc and Pa values will fall in the claims.  *Id.*  If ten samples are tested, the Wc and Pa values will depend on the mix of embossed and non-embossed regions tested over the ten samples.  *Id.*  As Dr. Runge admits, because "[t]he positioning of an emboss pattern will shift on sheets of a tissue from sheet to sheet," as "is readily apparent … in the Member's Mark product," the Wc and

Pa values obtained for ten tissue sheets may depend on the particular ten sheets that are tested.  Ex. 3 (Runge Reply) ¶19; *see also id.* ¶26; Ex. 4 (Runge Tr.) 170:19-25.  Dr. Keller tested ten sheets of accused tissue in the middle of each sheet, as Dr. Runge proposed, showing the center region that was tested.  Keller Dec. ¶¶63-66, Ex. A.  The average Wc, Pa, and uniformities of Wc and Pa for those ten sheets fell outside the claimed ranges.  *Id.*  Dr. Runge, however, performed this same testing on a different set of ten sheets and obtained materially different results.  Ex. 1 (Runge Op.) ¶61.  A simple comparison of Dr. Keller's testing to Dr. Runge's testing shows that whether the claims are met can depend on which ten samples are selected.  *Compare id. with* Keller Dec. ¶64.

Because the intrinsic record is ambiguous as to whether to test one sample or ten samples (and, if ten samples, how to select them) and this difference can materially impact the results, this is yet another reason the asserted claims are indefinite.  *Dow*, 803 F.3d at 635; *Honeywell*, 341 F.3d at 1339-40.

Dr. Runge contends that ten samples should be tested, ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

FQ's litigation position that testing ten samples is required appears to be an attempt to address the large sample-to-sample variability in the Wc and Pa values that FQ obtained, presumably because of testing over different amounts of embossing. Even though FQ had every incentive to show all samples infringe, FQ's experts' data demonstrates that Wc and Pa values for the accused product may fall outside the claimed ranges, and that there is tremendous sample-to-sample variation.[5]  Dr. Brown, for example, reports that one sample of accused tissue had Waviness Uniformity of 51.9 microns—almost double the claimed limit of 27 microns—and Amplitude Uniformity of 8.8 microns—above the claimed limit of 8 microns—while another sample of the same tissue had Waviness Uniformity of 11.3 microns and Amplitude Uniformity of 4.7 microns. Ex. 5 (Brown) ¶41 (*compare* #7 *with* #6).  This shows sample-to-sample variation of Waviness Uniformity that exceeds 350%.  *Id.*  FQ's experts' data thus confirms that whether one sample or ten samples are tested can lead to materially different surface roughness values, and the patents' lack of clarity about whether to test one sample or ten samples renders the claims indefinite.  *Dow*, 803 F.3d at 635; *Honeywell*, 341 F.3d at 1339-40.

---

[5] All but one asserted claim requires "Waviness [Wc] Uniformity of 27 microns or less" and/or "Amplitude [Pa] Uniformity of 8 microns or less." '203 pat., cls. 1 & 3; '872 pat., cls. 1, 3, 4 & 8; '853 pat., cls. 10, 12 & 13.  Those claimed uniformities of Wc and Pa are standard deviations, which measure the spread of measurements from their respective average. *Id.*, 10:63-11:4.

### f.       The patents provide no guidance as to software version

Yet another reason the asserted claims are indefinite is that the patents fail to specify which version of Omnisurf software to use, and the choice of version materially affects the calculated Wc and Waviness (Wc) Uniformity.  *Dow*, 803 F.3d at 633-34; *Teva*, 789 F.3d at 1341-45; *Pac. Coast*, 816 F. App'x at 460 (claims indefinite in part because a POSA "would not have known to use linear extrapolation rather than the psi calculation" to convert between board thicknesses).

Although the specification discloses use of "Omnisurf software," it fails to disclose which version.  '203 pat., 9:44-49.  Dr. Keller's unrebutted analysis shows that different versions yield materially different results.  Keller Dec. ¶¶97-104.  The current version of the Omnisurf software can result in Wc anywhere from 47% higher to 14% lower than the historical version (v3.52) that FQ now contends should be used.[6]  *Id.*  The current version also yields Wc Uniformity that can vary from 37% higher to 10% lower than v3.52.  These results are undisputed; FQ's experts chose not to investigate how different software versions affect the results.  Ex. 8 (Brown Tr.) 47:8-13, 150:25-151:8; Ex. 4 (Runge Tr.) 185:17-20.  Dr. Runge admits that choice of software versions may have "significant impacts on the testing and test results," and Dr. Brown concedes that a POSA cannot know the "precise algorithms" used in a particular software version because those algorithms are "proprietary."  Ex. 2 (Runge Reb.) ¶463; Ex. 8 (Brown Tr.) 148:5-11.

FQ cannot overcome the lack of clarity in the intrinsic record by offering expert opinion, *Dow*, 803 F.3d at 635, and, regardless, those opinions only reinforce the patents' failure to provide the public with "clear notice of what is claimed."  *Nautilus*, 134 S. Ct. at 2129.  Dr. Brown contends

---

[6] Irving was only able to obtain v3.52 from Digital Metrology by making a special request because it is no longer available to the public (for download on its website).  Keller Dec. ¶106.  FQ's position that a POSA must use this version, even though it is not specified in the patents and is obsolete, also raises the question of what a POSA is supposed to do when this version becomes inaccessible.  *Id.* ¶107.

that POSAs "would understand that they should use the same version of software as the inventors." Ex. 6 (Brown Reb.) ¶27; *see also* Ex. 2 (Runge Reb.) ¶461 (similarly stating that POSAs would "use the version of the OmniSurf software available at the time the patent was written").  But the patents do not identify what version to use, so a POSA would not know what version the inventors used.  Indeed, a POSA would have no reason to know that the software version makes a difference (without comparing the output of different versions).  Keller Dec. ¶108.  As a result, this is yet another reason that all the asserted claims are indefinite.

### 2. The Asserted Claims Lack Written Description Support

#### a. The patents describe no tissue having the claimed combinations of properties

Six asserted claims require a combination of (a) Wc (and in many asserted claims Pa) and (b) one of three other tissue properties.  The patents, however, do not disclose any tissue that has both (a) the claimed Wc (and Pa) characteristics *and* (b) any of the other properties—(i) "bulk softness of less than 10TS7" ('203 pat., cls. 1 & 3; '872 pat., cl. 4), (ii) hand-feel "softness of at least 90" ('853 pat., cl. 12), or (iii) "caliper of less than 650 microns" ('853 pat., cl. 13).  The patents describe only one tissue, Example 5, having the claimed Wc and Pa.  '203 patent,  9:62-10:59.  But Example 5 does not have the claimed bulk softness, hand-feel softness, or caliper.  Thus, claims 1 and 3 of the '203 patent, claim 4 of the '872 patent, and claims 12 and 13 of the '853 patent are invalid because they do not "clearly allow persons of ordinary skill in the art to recognize that [the inventors] invented what is claimed," i.e., tissue having the claimed combination of properties.  *Ariad*, 598 F.3d at 1351.

The experts agree that Example 5 is the only disclosed example of a tissue having Wc and Pa within the claimed ranges, and that the patents do not disclose the bulk softness, hand-feel softness or caliper of Example 5.  Ex. 4 (Runge Tr.) 197:14-199:3; Keller Dec. ¶¶109-18.  To the

contrary, the only disclosures of bulk softness, hand-feel softness, and caliper in the patents are in no way tied to a tissue having the claimed Wc and Pa. Those disclosures were in the provisional application, which did not even mention Wc or Pa. D.I. 81-11, 8 (¶¶15-16), 17 (¶¶56, 58); '203 pat., 2:22-25, 6:59-63, 7:11-13. The new disclosure about Wc and Pa, along with Example 5 that was added to the non-provisional application, contains no mention of bulk softness, hand-feel softness, or caliper. D.I. 81-12, 43-48 (¶¶84-100); '203 pat., 9:13-12:15.

None of the patents' disclosures of bulk softness, hand-feel softness, and caliper show that the inventors possessed a tissue falling within the claimed range of one of those properties *that also* has the claimed Wc and Pa. The patents contain two generic references, respectively, to "bulk softness of less than 10 TS7" and "caliper of less than 650 microns" that are not tied to any particular tissue—let alone a tissue having the claimed Wc and Pa. '203 pat., 2:24-25, 2:31-33, 6:59-60, 7:12-15. When, as here, the specification merely "provides formal textual support for each individual limitation recited in the claims" but "nowhere describes" any embodiment that has the combination of claimed features "together," the claims lack written description. *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1349 (Fed. Cir. 2013) (affirming JMOL of lack of written description).

The patents' generic disclosure of "softness or hand feel (HF) of at least 90" ('203 pat., 6:55-57), and disclosure in Table 1 that Comparative Example 1 and Examples 1-4 had hand-feel softness above 90, is likewise insufficient. *Novozymes*, 723 F.3d at 1349. None of those examples have the claimed Wc and Pa. While Example 5 comprises two plies of Example 1 "embossed together" ('203 pat., 9:64-67), Dr. Runge concedes that it is impossible to understand how an emboss pattern will affect "the overall feel of a tissue" without testing because of the "complex set of effects on final tissue properties" associated with embossing. Ex. 3 (Runge Reply) ¶¶58-59.

The patents also do not even specify the emboss pattern that was used. Dr. Runge has not disputed that "the disclosure of hand feel for Example 1 would not reasonably convey to a person of ordinary skill in the art what the hand feel of Example 5, which involves an unidentified embossing process, would be." Keller Dec. ¶113.

Dr. Runge instead states that "specification provides a roadmap" for achieving the claimed combinations because "the inventors described how to adjust various levers," so a POSA "would understand that the inventors were in possession of the ability to generate such inventive tissue and … would be able to create the same without undue experimentation."[7] Ex. 2 (Runge Reb.) ¶¶476, 478-79. But to meet the written description requirement, the specification needed to *describe* tissue having the claimed combination of properties to demonstrate that the inventors possessed it—not merely provide a "roadmap" so that it would have been obvious for a POSA achieve such a tissue. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (affirming summary judgment of lack of written description, explaining, "The question is not whether a claimed invention is an obvious variant of that which is disclosed in the specification. Rather, [the specification] itself must describe an invention, and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention ...."); *Novozymes A/S*, 723 F.3d at 1350 ("The question … is not whether one of ordinary skill in the art presented with the [specification] would have been enabled to [make the claimed subject matter], but whether the [specification] discloses the [claimed subject matter] to him, specifically, as something [patentee] actually invented."). The legal question is whether such a tissue was

---

[7] Even Dr. Runge concedes that adjusting these levers to achieve desired combinations of properties is difficult because tradeoffs are often required. Ex. 2 (Runge Reb.) ¶18 ("Often, achieving certain surface topographies will require tradeoffs with other properties, such as caliper, softness, and tensile strength—adding to the difficulty of achieving specific surface topographies in the context of a commercially viable product.").

*disclosed* within "the four corners of the specification"—and here, it was not. *Rivera v. ITC*, 857

F.3d 1315, 1322 (Fed. Cir. 2017) (affirming lack of written description).

> **b.** **The patents fail to show possession of the claimed broad ranges of Wc and Pa**

All asserted claims recite a broad genus of tissues having outer surfaces with Wc (and in

many cases Pa) falling within expansive ranges.  All claims recite "Average Peak to Valley

Waviness [Wc] of 140 [or 135] or less," all asserted claims except claim 4 of the '853 patent also

recite "Waviness [Wc] Uniformity of 27 microns or less," and some asserted claims—claims 1, 3,

4, and 8 of the '872 patent and claims 10, 12, and 13 of the '853 patent—further recite "an Average

Primary Amplitude [Pa] of 50 microns or less and an Amplitude [Pa] Uniformity of 8 microns or

less."  "But merely drawing a fence around the outer limits of a purported genus is not an adequate

substitute for describing" what "constitute[es] the genus and showing that one has invented a genus

and not just a species."  *Ariad*, 598 F.3d at 1350.  When, as here, the claims functionally claim a

broad genus of tissues based on test results—particular ranges of Wc and Pa—"the specification

must demonstrate that the applicant has made a generic invention that achieves the claimed result

and do so by showing that the applicant has invented species sufficient to support a claim to the

functionally-defined genus."  *Id.* at 1349.  Here, as in *Ariad*, the asserted claims lack written

description because the specification only discloses a single species that falls within the broadly

claimed ranges of Wc, Pa, and their uniformities.  *Id.* at 1349-51.

Not only does Example 5 provide just a single data point within each of the claimed ranges,

but also Example 5's Wc (123) and Pa (41) are toward the upper end of the claimed ranges (Wc $\leq$

135/140) and (Pa $\leq$ 50), respectively.  '203 pat., Tables 2 & 3.  The patents do not disclose a single

tissue falling within most of the scope of the claimed ranges of Wc or Pa (i.e., disclose no tissue

with Wc $\leq$ 120 or Pa $\leq$ 40).  Keller Dec. ¶¶122-25.  FQ has used the claimed ranges to fence off a

broad area that excludes the commercially available tissues in Tables 2 and 3, but the patents show possession of only one tissue along the fence line. *Id.* That fails the written description requirement. *Ariad*, 598 F.3d at 1350. There is no description of a tissue having Wc or Pa, e.g., in the middle of the claimed ranges, let alone toward their lower ends. *Id.*

Dr. Runge cannot identify any example, besides Example 5, that has Wc or Pa within the claimed ranges because there is none. He instead opines that the patents disclose "how to adjust various aspects of the tissue making process to achieve a TAD tissue over differing surface profiles less than the claimed upper limit(s) for each," citing disclosure of "different non-ionic surfactants," drying tissue "to a humidity within a specified range," adjusting "calendaring pressure," and possibly including "surface deposited additives." Ex. 2 (Runge Reb.) ¶¶471-72. But again his opinion is irrelevant to the written description issue. Even if a POSA presented with the specification could figure out how to achieve tissues spanning the claimed ranges of Wc and Pa,[8] the claims remain invalid for lack of written description because the "four corners of the specification" fail to show that the inventors "had possession of the invention as broadly claimed." *Rivera*, 857 F.3d at 1322; *Novozymes*, 723 F.3d at 1350 ("the written description requirement prohibits a patentee from leaving it to the … industry to complete an unfinished invention"); *see also Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 920 (Fed. Cir. 2004) ("the purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification").

---

[8] It is not apparent a POSA would know how to adjust the "various aspects" he identifies to do so because, as Dr. Runge admits, "the end product surface profile of a tissue is the result of the interactions of a myriad of factors." Ex. 2 (Runge Reb.) ¶18.

**B.** **Improper Expert Testimony On Copying and Damages Should Be Excluded**

    **1.** **FQ's Experts' Copying Opinions Should Be Excluded**

The Court should exercise its gatekeeping function to exclude Drs. Runge's and Maness's "opinions" that Irving copied FQ's products and patents because those opinions "do[] not meet the requirements of qualification, reliability and fit." *Schneider*, 320 F.3d at 404.  Their copying opinions should be excluded because they (1) are "unhelpful restatement[s] of the facts as [the experts] see[] them," *Sonos,* 297 F. Supp. 3d at 521; (2) impermissibly address Irving's "intent, motive, or state of mind," *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019); and (3) not grounded in reliable "scientific evidence," *Schneider*, 320 F.3d at 404.

First, "expert testimony on the issue of copying" should be excluded because it "is not likely to be helpful to the jury, which is fully competent to evaluate the evidence and draw its own conclusion." *Sonos*, 297 F. Supp. 3d at 521.  Whether copying has occurred is "a factual issue" that "is equally within the competence of the jurors to understand and decide," and thus "expert testimony" on this issue "is not helpful to the jury and, therefore, not admissible." *Id.*  Neither Dr. Runge's qualifications as a technical expert nor Dr. Maness's qualifications as a damages expert are "pertinent to [their] conclusions about copying."[9]  *Id.* (excluding plaintiff's infringement expert's copying opinion as well as those of plaintiff's invalidity and damages experts).  Here, as in *Sonos*, "[t]he jury may draw its own inferences" and "would not be aided by expert testimony," which consists of "summaries of the evidence and conclusory statements that imply that [Irving] copied [FQ's] technology." *Id.*; *see also* Ex. 1 (Runge Op.) ¶¶76-91; Ex. 3 (Runge Reply) ¶¶67-87; Ex. 13 (Maness Op.) ¶¶37, 43-44, 61; Ex. 14 (Maness Reply) ¶¶39-40.  While FQ "may, of

---

[9] Dr. Maness concedes he "[c]ertainly" does not have any expertise in copying of tissue products from a "technical standpoint." Ex. 15 (Maness Tr.) 19:6-9. *Alarm.com et al., Inc. v. SecureNet Techs. LLC*, No. 15-807-RGA, 2019 WL 133228, at *4 n.3 (D. Del. Jan. 8, 2019) (expressing doubt that a damages expert was qualified to opine on "copying").

course, still present evidence of copying to the jury," FQ should be precluded from "invoking the special imprimatur that accompanies its presentation by an expert." *Sonos*, 297 F. Supp. 3d at 522.

Second, these copying opinions also are improper because they incorporate inferences about Irving's "intent, motive, or state of mind" and regurgitation of factual evidence "by which such state of mind may be inferred." *AstraZeneca LP v. Tap Pharm. Prods., Inc.*, 444 F. Supp. 2d 278, 293 (D. Del. 2006) ("Expert witnesses are not permitted to testify ... regarding [the defendant's] intent, motive, or state of mind, or evidence by which such state of mind may be inferred."); *see also Zimmer*, 365 F. Supp. 3d at 497 (excluding expert opinions "evaluating Zimmer's subjective reliance on" opinions of counsel, i.e., that such reliance was "unreasonable"). Dr. Runge opines, for example, on what he believes "the *purpose* of Irving's" conduct was, what he believes "Irving's *goal*" was, *why* ███████████████████, and that Irving's alleged copying was "*deliberate*." Ex. 1 (Runge Op.) ¶78; Ex. 3 (Runge Reply) ¶¶74, 83; *see also id.* ¶¶76, 87. Dr. Runge thus impermissibly draws inferences about Irving personnel's "intent, motive or state of mind," which improperly "substitut[es] the expert's judgment for the jury's" judgment, and his summary of "evidence by which such state of mind may be inferred" is likewise not a proper subject of expert testimony. *AstraZeneca*, 444 F. Supp. 2d at 293; *Zimmer*, 365 F. Supp. 3d at 497.

Third, FQ's experts' copying opinions are not grounded in reliable "scientific evidence" because FQ's experts perform no analysis to identify any specific way in which Irving allegedly copied something FQ had done. *Schneider*, 320 F.3d at 404. Dr. Runge admits that he "made no comparison at all" between Irving's process for manufacturing the accused bathroom tissue and "First Quality's processes." Ex. 3 (Runge Reply) ¶70. Because Sam's Club contracted with Irving to become another supplier of the Member's Mark bathroom tissue that FQ also supplies, it is

hardly surprising the bathroom tissue Irving and FQ supply to the same customer to sell under the Member's Mark brand is similar from the customer's perspective.  Ex. 13 (Maness Op.) ¶¶35-37.  Dr. Maness opines, █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ does not mean that Irving copied any specific aspect of FQ's technology, rather than independently figuring out how to meet Sam's Club's demands without copying FQ's technology.  For example, the fact that an automotive company designed its vehicles to achieve 50 miles per gallon to match the performance of a competitor does not mean that it copied its competitor; to the contrary, it may have achieved that performance in a completely different way.

The only specific aspect of FQ's technology that Dr. Runge opines Irving copied is ████ ███████████████████████████████ (an unclaimed tissue property), contending that ████████████████████████████ "demonstrates a high degree of deliberate copying." Ex. 1 (Runge Op.) ¶78.  This "opinion" illustrates the broader lack of "scientific evidence" to support FQ's experts' copying views.  *Schneider*, 320 F.3d at 404.  Producing a product that matches the performance of a competitive product, e.g., ███████████████████, does not show that similar performance was achieved through copying.  *Alarm.com, Inc.*, 2019 WL 133228, at *4  (excluding a copying opinion where the evidence "[a]t most" showed that Defendant "had products with similar features" to those of Plaintiff).  Dr. Runge identifies nothing that Irving copied but rather emphasizes that his opinion rests on ███████████████████████████████

████████████████████████████████████████████████████████

██████. Dr. Runge asserts that "copying of a tissue [does not] require[] that every single detail



be mimicked down to every minute detail," but the problem is that he fails to identify a *single* detail that Irving allegedly copied. Ex. 3 (Runge Reply) ¶71.

Rather than compare FQ's processes or product to Irving's processes or product, Dr. Runge simply summarizes his view of Irving's conduct to infer that Irving must have copied something. Ex. 1 (Runge Op.) ¶¶76-91; Ex. 3 (Runge Reply) ¶¶67-87. Dr. Runge cites witness testimony and documents that he contends show ██████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████.[10]  *Id.*  His recitation of the record to suggest that Irving must have copied something is inadmissible because it is not an expert opinion based on "methods and procedures of science" applied to "scientific evidence." *Schneider*, 320 F.3d at 404; *Liqwd, Inc. v. L'Oréal USA, Inc.*, No. 17-14-JFB-SRF, 2019 WL 8014103, at *5 (D. Del. Jun. 25, 2019) (excluding an expert's summary of factual evidence to offer an impermissible opinion on what happened at a meeting).  The only technical analysis Dr. Runge performs is his analysis of whether products meet the patent claims, but even an admission of infringement "is not probative of copying." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1370 (Fed. Cir. 2011).

Dr. Runge's opinion that Irving ██████████████████████████████████

████████ is similarly inadmissible. Ex. 3 (Runge Reply) ¶83. It is the jury's province to infer whether ██████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████ *Id.* ¶68; *AstraZeneca*, 444 F. Supp. 2d at 293 (excluding expert opinion that

---

[10] Dr. Maness's copying opinion is merely a shorthand version of Dr. Runge's opinion that, in part, relies on Dr. Runge's opinion. Ex. 13 (Maness Op.) ¶¶37, 43-44, 61; Ex. 14 (Maness Reply) ¶¶39-40; Ex. 15 (Maness Tr.) 95:5-96:1.  It reads like a lawyer's summary of Dr. Runge's "opinion."

a party "was, in fact, seeking to utilize" certain data).  And putting aside that the quid pro quo of the patent system is that the public is free to use unclaimed aspects of a patent's disclosure, Dr. Runge identifies no evidence that ██████████████████████████████████████████ ██████████████████████  In fact, he does not even dispute that Irving did *not* use the specific way of producing tissue taught in the asserted patents, which includes using nonionic and ionic surfactants ('203 patent, 3:28-31), 70% or more hardwood pulp in exterior layers (*id.*, 3:27-54), and dewatering the pulp before it reaches the headbox (*id.*, 3:54-60).  Ex. 12 (Kavalew Reb.) ¶¶70-83; Ex. 1 (Runge Op.) ¶65 (showing less than 70% hardwood pulp in exterior layers); Ex. 3 (Runge Reply) ¶86.  He also ignores the undisputed fact that Irving had begun selling the accused bathroom tissue *before* the first asserted patent issued.  Ex. 13 (Maness Op.) ¶45 ("Irving was supplying … to Sam's Club by October 2015); '203 pat., Cover (issued Nov. 29, 2016).  Nonetheless, he concludes that Irving copied or relied on FQ's patent disclosures, but a jury does not need the help of an expert to decide whether Irving relied on those disclosures for its products.  *Sonos*, 297 F. Supp. 3d at 551-22.  Juries decide such fact issues by themselves all the time.

### 2.     The Court Should Exclude Dr. Maness's Damages Opinion

The Court should exercise its gatekeeping function to exclude Dr. Maness's damages opinion because, contrary to law, he (1) refuses to exclude any non-infringing products from his royalty base; (2) applies a rule of thumb to set his royalty rate to Irving's lowest annual profit margin for sales of the accused bathroom tissue; (3) effectively disgorges Irving's profits, without even opining on *lost* profits; (4) apportions no value to unpatented features of the accused bathroom tissue; and (5) bases his reasonable royalty in part on his legally erroneous opinion that Irving's paper towel sales to Sam's Club are convoyed sales.

**a.**   **Dr. Maness erroneously refuses to exclude non-infringing products from his royalty base**

Dr. Maness's damages opinion should be excluded because he violated the basic legal principle that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" A*straZeneca*, 782 F.3d at 1343  (quoting 35 U.S.C. § 284; reversing a portion of a damages award); *see also Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 411 (Fed. Cir. 2018) (similar).

Dr. Maness concludes that "the royalty base is all Irving's bathroom tissue sales to Sam's Club for the Member's Mark product starting from the opening of the damages period," and this "royalty base would not change" even "if some of the Irving Member's Mark product does not infringe." Ex. 15 (Maness Tr.) 50:1-5, 86:23-87:8; *see also id.* 84:20-85:12 ("There's a discussion in my reply report about why the royalty base would include all the tissue even if some of it didn't infringe …."). He justifies his refusal to exclude non-infringing bathroom tissue from the royalty base on the basis that it is "more efficient" to include this non-infringing tissue because "it would be in the interests of the parties to save the expense and cost and complication of trying to sort out what portion of the base infringes."[11]  *Id.* 85:14-86:9, 86:23-87:8.  But a damages expert may not excuse failure to comply with the statutory mandate that patent damages "are limited to those 'adequate to compensate for the infringement'" by stating that awarding damages on non-infringing products would "ease an 'administrative burden.'"  *Enplas*, 909 F.3d at 411-42 (quoting A*straZeneca*, 782 F.3d at 1343 (quoting 35 U.S.C. § 284)).  It is "improper to award ... reasonable royalty damages for the defendant's sale of the ... non-infringing products, because acts that do not

---

[11] Dr. Maness does not propose to reduce his damages computation in any other way to account for non-infringing product; his damages computation would not change even if some accused bathroom tissue does not infringe.  Ex. 15 (Maness Tr.) 89:6-15.

constitute patent infringement cannot provide a proper basis for recovery of damages under section 284." *Id.* (vacating damages).

Dr. Maness's refusal to exclude non-infringing product is particularly problematic because the jury would receive abundant evidence that at least some Irving's accused Member's Mark bathroom tissue does not infringe. Even according to data Dr. Runge presents, some accused bathroom tissue does not have "bulk softness of less than 10TS7," as multiple asserted claims require. Ex. 1 (Runge Op.) ¶63 (showing TS7 of 10.3); '203 pat., cls. 1 & 3; '872 pat., cl. 4. Dr. Keller also presents evidence of accused bathroom tissue that has Wc and Pa falling outside all asserted claims. Keller Dec. ¶¶64-71. The jury can credit such evidence. Dr. Maness's opinion must be excluded because it would encourage the jury to award damages on non-infringing tissue, which is legal error. *Enplas*, 909 F.3d at 411-12; A*straZeneca*, 782 F.3d at 1343; 35 U.S.C. § 284.

### b.      Dr. Maness impermissibly applies a rule of thumb

A reasonable royalty analysis cannot be based on applying a rule of thumb, but that is precisely what Dr. Maness did here by pegging his proposed royalty rate to Irving's lowest annual profit margin on accused bathroom tissue sales. *VirnetX, Inc. v Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) (rejecting a "50/50 profit-split" based on "the Nash Bargaining Solution" as an "inappropriate 'rule of thumb'") (citing with approval *Robocast v. Microsoft*, No. 10-cv-1055-RGA, 2014 WL 350062, at *3 (D. Del. Jan. 29, 2014), where this Court rejected the same); *Uniloc USA*, 632 F.3d at 1317 (striking down the 25% "rule of thumb" as "fundamentally flawed"). To permit this opinion would be legal error.

Dr. Maness pegs his "reasonable royalty ▮▮▮▮▮▮▮▮▮▮▮ to Irving's lowest annual profit margin on sales of its accused BRT [bathroom tissue], ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 14 (Maness Reply) ¶27. He states that his ▮▮▮▮▮▮▮▮▮▮ royalty is *based on* the lowest year of profitability for Irving," but it *is* Irving's "minimum profit ▮▮▮▮▮▮▮▮▮

██████ as Dr. Maness admitted at his deposition. *Id.* ¶¶27, 31; Ex. 15 (Maness Tr.) 45:25-46:3 ("Q. That royalty rate *is equivalent* to Irving's lowest annual profit margin for sales of bath tissue to Sam's Club; right?  A. During the damages, period, yes. *Yes*."). The ██████ rate Dr. Maness selected depends on nothing else besides the fact that this was Irving's lowest annual profit margin.  To illustrate, he admitted that if Irving's lowest annual profit margin had been higher, ██████ his proposed royalty would have been ████ conversely, if the profit margin had been lower, his proposed royalty rate would have been lower.  Ex. 15 (Maness Tr.) 46:4-48:19.

Dr. Maness thus applies a rule of thumb—his royalty rate equals Irving's lowest annual profit margin.  That is just as much a rule of thumb as those the Federal Circuit has rejected as bases for determining a reasonable royalty—using 25% of "the lowest value," 25% of "expected profits," or "a 50/50 profit split." *VirnetX*, 767 F.3d at 1332-33; *Uniloc*, 632 F.3d at 1311, 1313. Dr. Maness insists that he is not applying a rule of thumb, contending that his royalty rate "is based on facts specific to this case."  Ex. 14 (Maness Reply) ¶27.  But the only facts he identifies are "Irving's actual profit margin from accused sales," which he determined using "a mathematical analysis," and the fact that Irving could not have earned that profit if it had not made those accused sales because, in his view, there was no acceptable non-infringing alternative. *Id.*  Those are not case-specific facts.  In almost every patent case, there is a profit margin on the accused sales that would not have been obtained but for selling the accused product, and the patentee often contends that there was no acceptable non-infringing alternative.   Under Dr. Maness's approach, the patentee's damages expert can thus set the royalty at the lowest annual profit margin on the accused sales.  That is the "Maness rule of thumb."

As this case illustrates, the Maness rule of thumb can enable a plaintiff's damages expert to pick an even more extreme royalty rate than the 25% rule and 50/50 profit split.  Applying his

rule of thumb, Dr. Maness calculates total royalties ████████████████████████████ ███████████████████████████████████████████ Ex. 13 (Maness Op.) ¶¶77 (Table 7), 107 (Table 11); *see also* Ex. 14 (Maness Reply) ¶31 ("my ██████████ reasonable royalty … represents less than *60 percent of the total profits* earned by Irving's sales of accused products").

### c.   Dr. Maness unlawfully disgorges Irving's profits, without even opining on lost profits

Although Dr. Maness offers no lost profits opinion, he improperly seeks to reimburse FQ for lost profits by disgorging Irving's profits.  Dr. Maness's setting his royalty rate at Irving's lowest annual profit margin is, in effect, disgorgement of Irving's profits.  But disgorgement of profits is not an available form of damages in a patent case.  35 U.S.C. § 284; *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 654 (Fed. Cir. 1985) (explaining that disgorgement was eliminated in 1946).  While a defendant's profits can be considered in assessing lost profits, Dr. Maness has not tried to meet the high bar for opining on lost profits damages.

Dr. Maness conceded that he was not "asked to address lost profits in this case"—for good reason.  Ex. 15 (Maness Tr.) 16:8-10.  To obtain lost profits, a patentee must "prov[e] 'but for' causation," i.e., "that the infringement in fact caused the patentee's lost profits" and the patentee had the manufacturing capacity to make the sales on which it lost profits.  *Rite-Hite*, 56 F.3d at 1545, 1548.  In fact, Dr. Maness cannot show that FQ would have sold its own bathroom tissue to Sam's Club but for the alleged infringement for many reasons, ███████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ Ex. 15 (Maness Tr.) 55:9-14, 56:17-20; Ex. 13 (Maness Op.) ¶36.

Dr. Maness, however, tries to circumvent the elevated legal standard for lost profits damages by picking Irving's lowest annual profit margin as a purported "royalty rate."  But calling Irving's profit margin a "royalty rate" does not change the economic reality.  Dr. Maness proposes

awarding Irving's profit margin to FQ, which is disgorgement of profits, without a showing that FQ would have earned such profits but-for Irving's infringement (because he cannot do so).  Dr. Maness's damages opinion thus amounts to one legal error on top of another because § 284 does not authorize disgorgement, and FQ cannot recover lost profits.

### d.      Dr. Maness fails to apportion

By refusing to apportion any value to unpatented aspects of the accused bathroom tissue, Dr. Maness violated "[t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226; *see also CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (this is "the essential requirement for reliability under *Daubert*").  As the Federal Circuit has instructed, this Court should "exercise[] its gatekeeping authority" by excluding Dr. Maness's damages opinion "to ensure that only theories comporting with settled principles of apportionment [a]re allowed to reach the jury."  *VirnetX*, 767 F.3d at 1328 (damages testimony "should have been excluded").

Dr. Maness conceded that he did not apportion *any* value to ***anything*** besides the asserted patents—he attributed ***100%*** of the value to the asserted patents. Ex. 15 (Maness Tr.) 31:7-21 ("Q. So, when you say, 'no further apportionment beyond the value of the Patents-at-Issue was required or appropriate', ***are you saying that you attributed all of the value to the patented technology***? A. ***Yes.  Yes***. …"); Ex. 14 (Maness Reply) ¶6.  Dr. Maness does not dispute that technology embedded in the accused products, e.g., the use of through air dried (TAD) technology, preexisted the asserted patents by decades, but he apportioned zero value to use of this prior art technology. Ex. 15 (Maness Tr.) 29:17-30:10.  He made no attempt to ensure his royalty was "based on the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226. Dr. Maness also attributed no value to other factors that Irving's damages expert, Dr. James

Malackowski, explained affect the purchasing decisions of a customer such as Sam's Club.  Ex. 15 (Maness Tr.) 30:11-31:6, 32:23-33:25.

Dr. Maness also does not dispute Dr. Malackowski's identification of (i) technical aspects of the accused tissue that are not attributable to the patented technology (e.g., TAD technology, chemical additives, lint control, and tissue strength) and (ii) factors important to selection of a bathroom tissue supplier (e.g., capacity, delivery times, pricing, and package format).  Ex. 16 (Malackowski Reb.) ¶¶82-93.  Dr. Maness simply ignores them by attributing no value to any of them.  Ex. 15 (Maness Tr.) 31:7-21; Ex. 14 (Maness Reply) ¶6.  He thus violates "the substantive statutory requirement of apportionment of royalty damages to the invention's value" and therefore his opinion should be excluded.  *Ericsson*, 773 F.3d at 1226; *see also Acceleration Bay LLC v. Activision Blizzard Inc.*, No. 1:16-cv-00453-RGA, 2019 WL 4194060, at *4-5 (D. Del. Sept. 4, 2019) (excluding damages testimony for failure to apportion value to non-patented features).

Although the accused bathroom tissue may be the "smallest salable unit," "apportionment is still required" because the accused bathroom tissue "contains non-infringing features."  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018).  Dr. Maness justifies attributing all the value of the accused bathroom tissue to the patented technology based on his opinion "that, without the patented technology, Irving would have lost the Sam's Club BRT [bathroom tissue] business."  Ex. 14 (Maness Reply) ¶6.  "But this misses the point.  Whether viewed as valuable, important, or *even essential*, the patented feature must be separated."  *VirnetX*, 767 F.3d at 1329 (emphasis added).  "Further apportionment was required to reflect the value of the patented technology compared to the value of the unpatented elements."  *Finjan*, 879 F.3d at 1311.

Dr. Maness never asserts that he is applying the entire market value rule—the only "narrow exception" that would permit assigning all of the value to the patented technology.

*LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).  He could not do

so because there is no evidence that a customer has ever asked for—much less demanded—any

Wc or Pa values.  *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)) (entire market rule

requires "the patented feature drives the demand" for the entire product).  Dr. Maness concedes [REDAC]

Ex. 15 (Maness Tr.) 79:19-80:3; *see also* ███

███████████████████████████████████████████████████████████

███████████████  While customers demand tissue having certain other properties (e.g., softness

and strength), Dr. Runge, on whom Dr. Maness relies, did not investigate whether the claimed Wc

and Pa correlate with any of those properties.  Ex. 4 (Runge Tr.) 212:5-21.  Dr. Maness's testimony

is thus "inadmissible and should [be] excluded" because he "did not even try to link demand for

the accused" bathroom tissue "to the patented feature, and failed to apportion value between the

patented features and the vast number of non-patented features."  *VirnetX*, 767 F.3d at 1329.

### e. Dr. Maness erroneously opines that Irving's paper towel sales are convoyed sales

The final legal error requiring exclusion of Dr. Maness's damages opinion is that he treats

Irving's paper towel sales to Sam's Club as convoyed sales in arriving at his proposed royalty.

Those paper towel sales are not convoyed sales as a matter of law because *paper towels* and the

accused *bathroom tissue* undisputedly lack a functional relationship.  *Am. Seating Co. v. USSC

Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008) ("A 'convoyed sale' refers to the relationship

between the sale of a patented product and a *functionally associated* non-patented product."); *see

also Bioverativ Inc. v. CSL Behring LLC*, No. 17-cv-914-RGA, 2020 WL 1047755, at *3 (D. Del.

Mar. 4, 2020) (excluding convoyed sales opinions, explaining, "The patented and unpatented items

'*must function together* ... so as to produce a desired end product or result.'").

Dr. Maness contends that "Irving's paper towel sales to Sam's Club are convoyed sales resulting from Irving's position as a supplier of" bathroom tissue.  Ex. 14 (Maness Reply) ¶11; *see also* Ex. 13 (Maness Op.) ¶92.  Although he does not propose that damages should be awarded on those convoyed sales, his convoyed sales opinion infects his erroneous reasonable royalty analysis. He admits that his "opinion that Irving's paper towel sales to Sam's Club are convoyed sales" was "a factor that figured into [his] analysis under the *Georgia-Pacific* factors." Ex. 15 (Maness Tr.) 106:3-19.  Dr. Maness concluded "the presence of significant convoyed sales from the sale of paper towels provides a benefit to Irving and a cost of licensing to First Quality that confers additional bargaining power to First Quality." *Id.* 106:20-25; *see also* Ex. 13 (Maness Op.) ¶105. In his view, because "paper towel sales are properly considered convoyed sales," those sales "would significantly increase Irving's maximum willingness to pay, even above the total profits from the sale of TAD BRT alone." *Id.* ¶92.  Dr. Maness posits that, since he does not propose awarding damages on those paper towel sales, his proposed royalty is "conservative."  Ex. 15 (Maness Tr.) 106:3-15.

Dr. Maness's opinion that Irving's paper towel sales to Sam's Club constitute convoyed sales is legally erroneous because those paper towels and Irving's bathroom tissue are not "components of a single assembly or parts of a complete machine," and do not "together constitute[] a functional unit." *Am. Seating*, 514 F.3d at 1268; *see also Bioverativ*, 2020 WL 1047755, at *3 ("Courts have found a functional unit only where the unpatented item was largely rendered 'useless' without the counterpart patented feature or product, which is not the case here ...."). Dr. Maness admitted that paper towels and bathroom tissue are distinct products with distinct functions that customers seek and use for different applications. Ex. 15 (Maness Tr.)104:21-23; 105:5-8.  "Because it is clear that no interrelated or functional relationship inheres between"

bathroom tissue and paper towels, Dr. Maness's convoyed sales opinion is contrary to law and his damages opinion based in part on convoyed sales thus fails Rule 702's reliability requirement. *Am. Seating*, 514 F.3d at 1269; *see also Schneider*, 320 F.3d at 404.

Dr. Maness's opinion that paper towels constitute convoyed sales rests on precisely the kind of deficient basis that the Federal Circuit has rejected as a matter of law.  He admits that his opinion is not based on the need to purchase paper towels and bathroom tissue from the same supplier but rather on alleged "efficiencies, cost savings" of doing so, including "shipping efficiencies." Ex. 15 (Maness Tr.) 105:9-106:2; Ex. 14 (Maness Reply) ¶11 ("shipping and supply efficiencies").  But the "convenience or business advantage" of purchasing paper towels and bathroom tissue from the same supplier cannot support treating paper towel sales as convoyed sales.  *Am. Seating*, 514 F.3d at 1269 (affirming JMOL of no convoyed sales where items were sold together "for reasons of convenience and 'one-stop shopping,' not because of an absolute requirement that the two items function together"); *see also Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1370, 1376 (Fed. Cir. 2015) (district court erred in denying JMOL of no convoyed sales where items were sold together because of "convenience or business strategy").

## VI.    CONCLUSION

The Court should grant summary judgment that all asserted claims are invalid. Alternatively, the Court should preclude Drs. Runge and Maness from opining on alleged copying and exclude Dr. Maness's damages opinion.

ASHBY & GEDDES

*/s/ John G. Day*

*Of Counsel:*

Maximilian A. Grant
Matthew J. Moore
Inge A. Osman
Rebecca L. Rabenstein
Jeremiah A. Egger
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

Charles H. Sanders
David W. Rowe
Paul Weinand
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
(617) 948-6000

Dated:  March 19, 2021

_____
John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants*