IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FIRST QUALITY TISSUE, LLC,

    Plaintiff,

v.

IRVING CONSUMER PRODUCTS
LIMITED and IRVING CONSUMER
PRODUCTS, INC.,

    Defendants.

Civil Action No. 19-428-RGA

MEMORANDUM ORDER

On July 29, 2021, I issued a memorandum order (D.I. 233) ordering FQ to produce, *inter alia*, sixteen Microsoft Excel spreadsheets (the "Excel Analysis") prepared by Dr. Malburg of Digital Metrology between January and March of 2013, containing "analysis and interpretation" of previously collected Pa and Wc data. (*Id.* at 1, 6; D.I. 148 at 8). Over FQ's objections, I found the Excel Analysis was not covered by the attorney-client privilege because the evidence did not support FQ's contentions (1) that the Analysis was prepared at the direction of FQ's counsel or for the purpose of obtaining legal advice, nor (2) that the Analysis was ever communicated to FQ's counsel. (D.I. 233 at 4-5). FQ produced the Excel Analysis on August 2, 2021. (D.I. 252 at 4).

Upon reviewing the Excel Analysis, Irving noted it lists "over 1,000 *.prf data files as the 'Source' that Dr. [Malburg] interpreted using Omnisurf software to arrive at Pa values shown in the Excel files." (*Id.*). Irving seeks to compel production of these files ("the PRF files"), which FQ argues are covered by both attorney client privilege and the work product doctrine. (*Id.*). The

1

Special Master issued an opinion (D.I. 252) denying Irving's motion to compel production, finding the PRF files are covered by attorney client privilege. Irving objects and FQ opposes Irving's objections. (D.I. 261, 265).

I review the objections *de novo*.

From 2012-2013, Amster Rothstein & Ebenstein LLP ("Amster") worked with FQ "on patent prosecution and freedom to operate legal work relating to bath tissue." (D.I. 189-2 (Hausig Jan. 29, 2021 Decl.) ¶ 3). "In relation to that work, in February 2012, Amster retained Dr. [] Malburg to act as a technical expert and consultant for First Quality." (*Id.*). "Around June 2012," Mr. Hausig, an Amster attorney, directed FQ "including at least through confidential telephonic conversations with Dr. James Sealey, to perform profilometer testing on various tissues, to create PRF reports solely for use in connection with obtaining necessary information for ongoing freedom to operate and patent prosecution legal work relating to bath tissue." (D.I. 262-1 Ex. D (Hausig Aug. 19, 2021 Decl.) ¶ 4). The PRF files contain the raw data generated from that testing. (*Id.*; D.I. 252 at 3).

Irving objects that the PRF files are not privileged because they contain "purely factual data," and the attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts . . . ." (D.I. 261 at 4 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981))). As I have previously explained, however, "Attorney-client privilege applies to communications involving technical information when they are made for the purpose of providing or obtaining legal advice." (D.I. 233 at 5 (citing *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000))). "[T]he central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal

2

advice or services." *In re Spalding*, 203 F.3d at 805. Here, the evidence shows that the PRF files were generated at the direction of Amster for the exclusive purpose of aiding Amster in providing freedom to operate and patent prosecution legal opinions. (D.I. 262-1 Ex. D ¶ 4); *see Kimberly-Clark Corp. v. Tyco Healthcare Retail Grp.*, 2007 WL 1246411, at *1 (E.D. Wisc. 2007) (holding testing information was privileged where plaintiff was "not seeking to shield otherwise discoverable information merely by disclosing it to its attorney," but rather, "the attorney's existence, and his rendering of legal advice, were the *sine qua non* of the information in the first place").[1]

Therefore, the relevant question, as it was with the Excel Analysis of the PRF files, is whether the information contained in the PRF files was actually communicated to Amster. I find that FQ has met its burden in showing that it was. Mr. Hausig declared that he "had a number of confidential telephonic meetings with Dr. Sealey about the PRF reports created at my direction," and that he "visited First Quality January 15-16, 2013 and over the course of the multi-day visit [] discussed confidentially the PRF reports and their contents with Dr. Sealey and other First Quality

---

[1]   Irving argues *Kimberly-Clark* is "contrary to *Upjohn* and *Pfizer*." (D.I. 261 at 4). I disagree. *Upjohn*'s holding that the inclusion of "underlying facts" in a communication to an attorney does not privilege those underlying facts assumes the client has knowledge of the underlying facts apart from the attorney-client communication. *Upjohn*, 449 U.S. at 395-96 (explaining a client "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney").

Here, the PRF files did not pre-exist the communication between FQ and Amster – they were created as part of that confidential communication for the purpose of obtaining legal advice. For this reason, Irving's reliance on *Pfizer* is also inapt, because the PRF files cannot be "extracted" from the privileged communication – they are one and the same. *Pfizer Inc. v. Ranbaxy Lab'ys, Ltd.*, 2004 WL 2323135, at *1 (D. Del. 2004) ("Documents sent or prepared by counsel containing [] factual information for the purpose of obtaining or giving legal advice are protected from disclosure, but to the extent purely factual information can be extracted, such information is discoverable.").

3

employees, solely for legal purposes." (*Id.* ¶¶ 5-6). Thus, I find the PRF files are protected by attorney-client privilege.

Irving cites no authority in support of its argument, "FQ's non-privileged use of [the PRF files to create the Excel Analysis] further evidences that they are not privileged." (D.I. 261 at 5). Therefore, I am not persuaded by it. My previous finding (D.I. 233 at 5-6) that the additional analysis and interpretation Dr. Malburg conducted for First Quality later in 2013, which resulted in the Excel Analysis, is not privileged, has no bearing on the issue here. Although the Excel Analysis is based on the PRF files, the two sets of files were created at different times, under separate consulting agreements. (*See* D.I. 262-1 Ex. D ¶¶ 3-6; D.I. 233 at 3-4). The PRF files were created by Dr. Malburg for Amster and were shared and discussed with Amster attorneys (D.I. 262-1 Ex. D ¶¶ 3-6), whereas there is no evidence to show Amster ever even received the Excel Analysis (D.I. 233 at 3-4).

Irving argues,[2] "Even if the *.prf files had been privileged, FQ waived that privilege by intentionally producing 200 of those files to support validity." (D.I. 261 at 7). Federal Rule of Evidence 502(a) states that when a "disclosure is made in a federal proceeding . . . [that] waives the attorney-client privilege . . ., the waiver extends to an undisclosed communication or information in a federal . . . proceeding" so long as "(1) the waiver is intentional; (2) the disclosed

---

[2] Although the Special Master addressed this argument, he also found that Irving had waived it, because Irving did not object to the Special Master's summary rejection of Irving's previous attempt to assert waiver under FRE 502(a) in Special Master Order #3. (D.I. 252 at 7). I disagree that Irving has waived this argument. Irving's waiver argument here is narrower than its previous waiver argument and depends on facts it did not know until the Excel Analysis was produced in August of 2021 (*e.g.*, that all the PRF files were generated around the same time and were summarized in a single document).

4

and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."

I agree with the Special Master that the "same subject matter" requirement of the second prong should be interpreted narrowly. (D.I. 252 at 8). Irving argues that all the *.prf files referenced in the Excel Analysis "must be considered together, in context, because FQ should not be allowed to produce selected *.prf files to distinguish certain prior art tissues while withholding *.prf files for other prior art tissue that may disprove that distinction." (D.I. 261 at 8). FQ responds that granting Irving's request "would be no different than having First Quality turn over every privileged document having a *.pdf extension merely because it produced non-privileged *.pdf files during discovery." (D.I. 7 265 at 7).

I find that the Special Master's interpretation of "same subject matter" strikes the correct balance between the parties' extreme positions. (*See* D.I. 252 at 8). "If the withheld *.prf files related to the same prior art tissues as the produced *.prf files, then the 'same subject matter' requirement would be met." (*Id.*). The Special Master found that the withheld *.prf files relate to different tissues than the disclosed *.prf files, and therefore concluded FQ had not waived privilege under FRE 502(a). (*Id.*). Irving argues, however, "FQ did not even produce all the *.prf files for a particular tissue," and points to examples in the Excel Analysis relating to "Charmin Soft" entries. (D.I. 261 at 8 n.8 (citing D.I. 262-1 Ex. A)).

In light of this factual disagreement, I hold the following. In producing 200 *.prf files containing raw Wc and Pa data for the tissues included in the Asserted Patents' Specification, FQ waived privilege over any other *.prf files referenced in the Excel Analysis pertaining to those same prior art tissues: Charmin Basic (purchased July 2012 at Walmart – Anderson), Charmin

Strong (purchased July 2012 at Target – Anderson), Charmin Soft (purchased June 2012 at Walmart – Anderson), Charmin Soft (purchased January 2012 at Walmart – Anderson), Charmin Strong (purchased January 2012 at Walmart – Anderson), Cottonelle Clean Care (purchased January 2012 at Walmart- Anderson), Cottonelle Ultra (purchased January 2012 at Walmart – Anderson), Comfort Care Target UP & UP Soft and Strong (purchased September 2012 at Target – Anderson). ('203 Patent at 10; D.I. 262-1 Ex. A). It does not matter if the testing was conducted on a different day, using different parameters, on a different sample from the same batch, or purportedly for a different purpose.[3] FQ chose to disclose some of the raw *.prf data it had to support validity; it cannot, at the same time, selectively withhold *.prf data from those same prior art tissues. I find that this sufficiently addresses Irving's concern regarding "the use of privilege as a weapon." (D.I. 261 at 8 (quoting *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 361 (3d Cir. 2007))).

Finally, I agree with the Special Master's conclusion and adopt his reasoning in full that, while the PRF files are protected attorney work product, "Irving has shown a substantial need otherwise justifying production." (D.I. 252 at 9-11). Therefore, work product doctrine does not preclude my finding that FQ must produce any of the PRF files that relate to tissues listed in Tables 2 and 3 of the Specification.

---

[3] I am skeptical of FQ's representation, "The undisputed record evidence reflects that the specific *.prf reports at issue in Irving's objection were not created for or related to prosecution of the asserted patents but rather for other purposes." (D.I. 265 at 7). The only evidence FQ cites in support of this claim is Mr. Hausig's August 19, 2021 Declaration, in which he states that the PRF files were created "solely for use in connection with obtaining necessary information for ongoing freedom to operate *and patent prosecution legal work* relating to bath tissue." (D.I. 262-1 Ex. D ¶ 4 (emphasis added)). Mr. Hausig's declaration clearly does not preclude the possibility that some of the PRF files were created in relation to prosecution of the Asserted Patents.

For these reasons, while I agree with almost all of the Special Master's analysis (D.I. 252), and ADOPT it, I think the Special Master's Order denying Irving's motion to compel (D.I. 242) needs to be VACATED to the extent it completely denied Irving's motion. Plaintiff is ORDERED to produce any of the PRF files referenced as a "source" in the Excel Analysis that contain raw data from testing conducted on the same prior art tissues ("same" meaning from the same batch, as defined by purchase date and location) as the ones whose Pa and Wc values are disclosed in Tables 2 and 3 of the Specification. Irving's motion is otherwise DENIED. In view of the pending trial date, Plaintiff is ORDERED to produce such PRF files as soon as possible.

Entered this 31st day of March, 2022.

_____
United States District Judge