IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FIRST QUALITY TISSUE, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>IRVING CONSUMER PRODUCTS LIMITED<br>and IRVING CONSUMER PRODUCTS, INC.,<br><br>    Defendants. | C.A. No. 19-428-RGA<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF FIRST QUALITY TISSUE, LLC'S
BRIEF IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW AND MOTION FOR NEW TRIAL**

FISH & RICHARDSON P.C.
Warren Keith Mabey, Jr. (No. 5775)
Joseph B. Warden (No. 6604)
Nitika Gupta Fiorella (No. 5898)
Kelly A. Del Dotto (No. 5969)
Casey M. Kraning (No. 6298)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
Telephone: 302-652-5070
Facsimile:   302-652-0607
mabey@fr.com; warden@fr.com;
fiorella@fr.com; kad@fr.com;
kraning@fr.com

Edmond R. Bannon
Jeffrey C. Mok
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile:  (212) 258-2291
Email:  bannon@fr.com; jmok@fr.com

*Attorneys for Plaintiff*
*First Quality Tissue, LLC*

Dated: June 21, 2022

## TABLE OF CONTENTS

Page

I.      NATURE AND STATE OF PROCEEDINGS.................................................................. 1

II.     SUMMARY OF ARGUMENT ...................................................................................... 1

III.    LEGAL STANDARDS .................................................................................................. 2

IV.     STATEMENT OF FACTS ............................................................................................. 2

V.      ANALYSIS.................................................................................................................... 3

        A.      There is not legally sufficient evidence that the 2010 Charmin Ultra Soft meets
                the surface roughness limitations ........................................................................... 3

        B.      There is not legally sufficient evidence that the 2010 Charmin Ultra Soft meets
                the bulk softness and softness limitations ............................................................ 12

        C.      First Quality intends to appeal the jury's finding of no infringement ................. 14

VI.     CONCLUSION............................................................................................................ 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bearman v. Prudential Ins. Co.*,
   186 F.2d 662 (10th Cir. 1951) ........................................................................5

*Belden Techs. Inc. v. Superior Essex Commc'ns LP*,
   802 F. Supp. 2d 555 (D. Del. 2011) ................................................................2

*Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*,
   55 F.3d 615 (Fed. Cir. 1995) .........................................................................16

*Broadcom Corp. v. Emulex Corp.*,
   732 F.3d 1325 (Fed. Cir. 2013) .....................................................................16

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) .........................................................................................7

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
   668 F.3d 1340 (Fed. Cir. 2012) .......................................................................2

*Finnigan Corp. v. Int'l Trade Comm'n*,
   180 F.3d 1354 (Fed. Cir. 1999) ...............................................................13, 14

*Homeland Housewares, LLC v. Whirlpool Corp.*,
   865 F.3d 1372 (Fed. Cir. 2017) .......................................................................8

*Invista N. Am. S.A.R.L. v. M & G USA Corp.*,
   35 F. Supp. 3d 583 (D. Del. 2014) ..................................................................2

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
   292 F.3d 728 (Fed. Cir. 2002) .......................................................................13

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004) ...................................................................4, 7

*Noven Pharms., Inc. v. Amneal Pharms. LLC* ......................................................10
   2020 WL 11191445 (D. Del. Sept. 4, 2020)

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
   536 F.3d 1256 (Fed. Cir. 2008) .....................................................................11

*Quintana-Ruiz v. Hyundai Motor Corp.*,
   303 F.3d 62 (1st Cir. 2002) .............................................................................5

*Schumer v. Lab'y Comput. Sys., Inc.,*
    308 F.3d 1304 (Fed. Cir. 2002)..................................................................4, 7, 8, 14

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,*
    655 F.3d 1364 (Fed. Cir. 2011)..................................................................10

*SunTiger, Inc. v. Sci. Rsch. Funding Grp.,*
    189 F.3d 1327 (Fed. Cir. 1999)..................................................................16

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,*
    308 F.3d 1167 (Fed. Cir. 2002)..................................................................10

*Webster v. Offshore Food Serv., Inc.,*
    434 F.2d 1191 (5th Cir. 1970) ..................................................................5

**Other Authorities**

Fed. R. Civ. P. 50(a)(1)....................................................................................2

## I.    NATURE AND STATE OF PROCEEDINGS

First Quality has moved for judgment as a matter of law, or in the alternative a new trial, due to fundamental deficiencies in Irving's proof on alleged anticipation.

On April 29, 2022, after a five-day trial, the jury returned a verdict finding that First Quality's asserted claims on tissue, claims 1 and 4 of the '872 patent, claims 1 and 3 of the '203 patent, and claims 4, 12, and 13 of the '853 patent, are invalid as anticipated.  The jury also found no infringement, and no invalidity for lack of written description or indefiniteness.

The sole piece of prior art Irving presented at trial was an old physical sample of Charmin Ultra Soft bath tissue that was manufactured in 2010 ("2010 Charmin Ultra Soft").  The 2010 Charmin Ultra Soft made its way to Irving in this case after moving through multiple entities and storage environments in the more than a decade since its manufacture.

## II.    SUMMARY OF ARGUMENT

1.    Judgment as a matter of law, or in the alternative, a new trial, is appropriate because there is no legally sufficient evidence, let alone "clear and convincing" evidence, for the jury to have found anticipation.  Irving presented only present-day test results for claimed surface roughness parameters of the 2010 Charmin Ultra Soft.  These results were measured about a decade after the patents' critical period, long after the date of invention for the asserted claims in 2012.  Tissue changes over time—it ages.  In an attempt to overcome its gap in evidence from the critical period, Irving argued the properties of the 2010 Charmin Ultra Soft did not change over time, and thus Irving's present day test results can be taken as results from the critical period.  Irving's arguments are conclusory and unsupported.  Irving's expert, Dr. Steven

1

Keller, even admitted that he did not know whether the claimed surface roughness parameters of the prior art had changed in the twelve years since it was manufactured.

2.      Further, Irving did not provide any corroborating evidence for the claimed bulk softness and softness properties, relying solely on the oral testimony of Irving's other expert, Mr. Dale Kavalew.  Uncorroborated oral testimony is insufficient as a matter of law to satisfy the requirement of clear and convincing evidence for invalidity.

## III.   LEGAL STANDARDS

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue.  Fed. R. Civ. P. 50(a)(1); *see also ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1344-45 (Fed. Cir. 2012) (applying standard to reverse denial of JMOL of invalidity).  The decision to grant a new trial is within the Court's discretion and, unlike judgment as a matter of law, the Court need not view the evidence in the light most favorable to the verdict winner.  *See Invista N. Am. S.A.R.L. v. M & G USA Corp.*, 35 F. Supp. 3d 583, 592 (D. Del. 2014).  New trials are "commonly granted … where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice[.]"  *Belden Techs. Inc. v. Superior Essex Commc'ns LP*, 802 F. Supp. 2d 555, 562 (D. Del. 2011).

## IV.   STATEMENT OF FACTS

The asserted patents describe a type of bath tissue called through air dried tissue ("TAD").  *See* PTX-0001 at Abstract, 1:49-52; Tr. 159:17-161:12 (Sealey).[1]  The claims are directed to properties of a tissue's surface that are at a micron level, that is, at the scale of 1/1000 of a millimeter.  Tr. 172:12-173:20 (Sealey).

---

[1] The asserted patents (PTX-0001, PTX-0003, and PTX-0005) share a specification.  For brevity's sake, First Quality will cite only to PTX-0001 when referring to the specification.

2

The 2010 Charmin Ultra Soft prior art sample was obtained by Irving pursuant to a subpoena issued from Irving to Procter & Gamble.  Tr. at 779:23-780:19 (Engel).  The subpoena also compelled the testimony of a Procter & Gamble witness, Ms. Heather Engel.  She testified that so far as Procter & Gamble is aware, the 2010 Charmin Ultra Soft had been moved and stored in various locations.  Tr. at 779:21-780:12, 780:25-782:2, 785:21-786:4, 787:13-789:16 (Engel).  As Ms. Engel explained, the 2010 Charmin Ultra Soft was manufactured in Green Bay, Wisconsin in 2010.  Tr. at 785:4-5 (Engel).  Later, it was purchased by Procter & Gamble through another company named IPPS in November 2010.  Tr. at 780:25-781:19 (Engel).  IPPS had stored the sample for a period of time, and Ms. Engel did not know the storage conditions that the sample was stored in at IPPS.  Tr. at 788:20-22 (Engel).  At some point, the 2010 Charmin Ultra Soft was moved to and stored in an R&D storage area.  Tr. at 787:10-17 (Engel).  Ms. Engel did not know the temperature and humidity conditions in that R&D storage area.  Tr. at 787:23-788:14 (Engel).  Then in 2017, it was moved to Ms. Engel's office and taken out of its box.  Tr. at 787:5-17 (Engel).  Afterwards, the 2010 Charmin Ultra Soft was moved to an off-site warehouse in Cincinnati, Ohio.  Tr. at 788:23-789:6 (Engel).  Ms. Engel did not know whether this off-site warehouse had temperature or humidity controls.  Tr. at 789:11-16 (Engel).  A few years later, in August 2020, it was shipped to Irving.  Tr. at 786:21-787:4, 788:23-789:1 (Engel).  No evidence was presented about how Irving stored the 2010 Charmin Ultra Soft prior to testing.

## V.    ANALYSIS

### A.  There is not legally sufficient evidence that the 2010 Charmin Ultra Soft meets the surface roughness limitations

Every asserted claim is directed to a through air dried tissue "comprising an outer surface having" among other features, at least one of the following four limitations on surface roughness features that fall within a specific range: an Average Primary Amplitude (also referred to as

3

"Pa") of 50 microns or less, an Average Peak to Valley Waviness (also referred to as "Wc") of 140 microns or less, an Amplitude Uniformity of 8 microns or less, and a Waviness Uniformity of 27 microns or less. These parameters are calculated from measurements using a profilometer according to a procedure set forth in the patents. PTX-0001 at 9:31-59.

"Typically, testimony concerning anticipation must be testimony from one skilled in the art and must identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference. The testimony is insufficient if it is merely conclusory." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) (quoting *Schumer v. Lab'y Comput. Sys., Inc.*, 308 F.3d 1304, 1315-16 (Fed. Cir. 2002)). Irving did not put forward any values for these surface roughness limitations for the 2010 Charmin Ultra Soft from the critical period. Instead, Irving relied on present-day test results obtained about a decade after the critical period, and argued that the properties have not changed, such that the present-day test results reflect results from the critical period. But Irving failed to provide clear and convincing evidence that the properties of the 2010 Charmin Ultra Soft in fact did not change, and that the present-day measurements of the surface roughness limitations can substitute for measurements from years ago, during the critical period.

The weight of the evidence is clear that bath tissues such as the 2010 Charmin Ultra Soft generally degrade. For example, Irving's expert Dr. Keller conceded that there are a lot of conditions in which bath tissues degrade, and that such degradation would depend on many things. Tr. at 897:23-898:5 (Keller) ("Q. Okay. But there are a lot of conditions in which that bath tissue would degrade right? A. Yes. Q. Depending on the environmental conditions, right? A. Yes. Q. And that would depend on many things, just as with other papers; right? A. Many things, yes."). Irving's own internal documents, without dispute, discuss the aging of through air

4

dried tissue as a "general learning[.]"  PTX-414 (describing "Ageing of TAD: Loss of bulk over

time, can also affect pattern definition[.]").

      First Quality's expert, Dr. Troy Runge, explained in-depth the physics behind

degradation of tissues over time, including effects of acidic components in tissue, stretching and

breaking of tissue fiber bonds due to humidity and temperature changes, biological breakdown of

tissues from microbes such as mold, and effects of compression and tension.  Tr. at

1023:14-1032:10 (Runge); *see Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62, 76-77 (1st

Cir. 2002) (explaining a jury may generally not "disregard arbitrarily the unequivocal,

uncontradicted, and unimpeached testimony of an expert witness where . . .  the testimony bears

on technical questions . . . beyond the competence of lay determination.") (quoting *Webster v.*

*Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970) (internal citation omitted)); *see*

*also Bearman v. Prudential Ins. Co.*, 186 F.2d 662, 665 (10th Cir. 1951) (same).

      Even without Dr. Runge's testimony, Irving's experts did not dispute that compression

and tension causes changes in tissue properties.  Irving's experts also did not dispute that

humidity and temperature changes over time cause the stretching and breaking of bonds.  Indeed,

Dr. Keller conceded that humidity can cause changes in tissue properties.  Tr. at 898:13-899:18

(Keller).  And Mr. Kavalew conceded that he did not test whether the packaging of the 2010

Charmin Ultra Soft was humidity proof.[2]  Tr. at 979:14-17 (Kavalew).  Dr. Keller also conceded

that he did not have experience with microbes such as mold, and had no idea how to identify if

mold is present in a tissue.  Tr. at 899:23-900:11 (Keller).

---

[2] In fact, Mr. Kavalew did not even handle the packaging or inspect it in person.  Tr. at 979:8-13
(Kavalew).

Irving's Dr. Keller identified a single situation in which a package of tissues would allegedly not degrade—he testified that he would not "expect the properties of packaged tissue products to change under ***reasonable*** storage conditions[.]"  Tr. at 825:22-24 (Keller) (emphasis added).  But critically, Irving did not put forward any evidence on what constitutes "reasonable" storage conditions; for example, what humidity, what temperature, and what length of time?  Nor did Irving put forward any evidence that the 2010 Charmin Ultra Soft was actually kept in "reasonable" storage conditions.  Indeed, Irving and its experts do not know what the storage conditions were for the 2010 Charmin Ultra Soft.  Ms. Engel, the Procter and Gamble witness, could not even confirm whether, for the 2010 Charmin Ultra Soft, "the temperature or humidity changed drastically at any time" since the 2010 Charmin Ultra Soft was kept in storage.  Tr. at 788:11-14 (Engel).  There is no evidence, let alone clear and convincing evidence, about the storage conditions in which the 2010 Charmin Ultra Soft was kept since it was manufactured.

Irving's Dr. Keller pointed to four "considerations" he relied on to find that the 2010 Charmin Ultra Soft still allegedly has its original properties: (1) that its caliper is allegedly unchanged; (2) that its strength is allegedly unchanged; (3) that Dr. Runge's caliper measurement allegedly matches historical data in a Kimberly-Clark patent; and (4) that its roll diameter is allegedly unchanged.  Tr. at 834:13-837:16 (Keller).  But none of Dr. Keller's considerations are sufficient evidence, because each is conclusory, contrary to the evidence in the case, or otherwise unsupported.  *See Koito Mfg.*, 381 F.3d at 1152 ("General and conclusory testimony … does not suffice as substantial evidence of invalidity."); *Schumer*, 308 F.3d at 1315-16 (stating that "to accept confusing or generalized testimony as evidence of invalidity is improper."); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when

indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

As to Dr. Keller's first two considerations, that the 2010 Charmin Ultra Soft's caliper and strength are allegedly unchanged, Dr. Keller testified that he relied on test data from Mr. Kavalew, explaining in his direct testimony as follows:

> Q.  How did the thickness and the strength of the 2010 Procter & Gamble Charmin Ultra Soft today compare to the historical data from 2010 and '11?
>
> A.  Those two properties remained unchanged.
>
> Q.  Did the 2010 Procter & Gamble Charmin Ultra Soft become thinner or weaker over time?
>
> A.  No, it did not.

Tr. at 835:11-17 (Keller).  This testimony is conclusory and unsupported by the record.  Dr. Keller failed to refer to any specific evidence to show that the caliper (what Dr. Keller also refers to as "thickness") and strength of the 2010 Charmin Ultra Soft are allegedly "unchanged."

Looking to all the evidence submitted by Mr. Kavalew on caliper and strength (since Dr. Keller did not identify any specific evidence), nothing shows that the two parameters are unchanged as Dr. Keller posited.  For caliper, Mr. Kavalew testified that the caliper is "right in the same range of when the samples were tested in the 2010, 2011 time period."  Tr. at 948:17-23 (Kavalew).  Being "unchanged" is plainly not the same as being vaguely "right in the same range," and the record is devoid of any analysis to reconcile that inconsistency.  Further, Mr. Kavalew refers to DTX-462, what he calls a "very extensive database from Irving" with analysis from the 2010, 2011 time period.  Tr. at 948:2-23 (Kavalew).  But Mr. Kavalew did not identify any specific data from DTX-426 to support his opinion, and he also did not explain how any of the data in DTX-426 allegedly compares to the caliper of the 2010 Charmin Ultra Soft prior art sample.  As to strength, Mr. Kavalew testified about cross-directional tensile strength, and

referred to four numbers from four different samples taken in 2010: 159, 163, 164, and 188 (no units were provided by Mr. Kavalew).  Tr. at 948:24-949:19 (Kavalew).  Mr. Kavalew then said that the 2010 Charmin Ultra Soft had a tensile of 174.3, without any corroborating test results or even an explanation of how he obtained that value.  *Id.*  As is evidenced on its face, nothing about this data shows that the 2010 Charmin Ultra Soft is unchanged—174.3 is not the same as 159, 163, 163, or 188.  And there is no meaningful analysis in the record explaining why these numbers show that the strength of the 2010 Charmin Ultra Soft is unchanged.  Notably, Mr. Kavalew even concedes that the data from Irving's records is not for the same Charmin Ultra Soft that is used as the prior art sample.  Tr. at 949:20-950:4 (Kavalew).  Dr. Keller's testimony relating to caliper and strength should be rejected as inconsistent with the record.  *See Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1378 (Fed. Cir. 2017) ("[W]e must disregard the testimony of an expert that is plainly inconsistent with the record…"); *Schumer*, 308 F.3d at 1315-16 (stating that "to accept confusing or generalized testimony as evidence of invalidity is improper.").  Dr. Keller's first two considerations cannot support his conclusion that the properties of the 2010 Charmin Ultra Soft have not changed.

Next, Dr. Keller's third consideration, that Dr. Runge's caliper measurement on a Procter & Gamble product allegedly matched historical data appearing in a Kimberly-Clark ("K-C") patent, is also unsupported.  Dr. Keller testified to a series of alleged calipers that he derived from a K-C patent, and he purportedly compared them to Dr. Runge's measurements.  But, as with Mr. Kavalew's caliper and strength numbers discussed above, none of Dr. Keller's calculated calipers and Dr. Runge's measurements actually match.  The numbers are simply different, and Dr. Keller did not provide any theory or analysis showing that they nevertheless

can be considered a match.  Thus, Dr. Keller's third consideration is flawed and also cannot support his conclusion that the properties of the 2010 Charmin Ultra Soft have not changed.

Dr. Keller's fourth consideration, that roll diameter is unchanged, is also flawed.  Dr. Keller relied on the roll diameter for the 2010 Charmin Ultra Soft allegedly having not changed since the time of manufacture.  Tr. at 847:6-12 (Keller).  However, Dr. Keller did not test, and has no test data for, the roll diameter of the 2010 Charmin Ultra Soft from the time of manufacture.  Instead, he compared alleged data for the 2010 Charmin Ultra Soft (none of which is in evidence or corroborated by any evidence) with data for a completely different roll that was tested in 2010.  Tr. at 846:16-18 (Keller).  And rather than finding that the data actually matched, Dr. Keller conceded that "there was a slight difference," and later acknowledged there were multiple such differences.  Tr. at 846:24-847:12 (Keller).  Dr. Keller summarily noted that "the differences are easily attributed to roll-to-roll differences."  Tr. at 847:6-12 (Keller).  However, he offered no analysis on these alleged roll-to-roll differences, such as how he could conclude there were roll-to-roll differences, the impact of these differences on his comparison between the 2010 Charmin Ultra Soft and a completely different roll that was tested in 2010, or why any of his comparisons were even valid in view of roll-to-roll differences.  Nor did Dr. Keller analyze what "slight differences" meant in the context of the relevant micron scale for the claimed properties at issue.  Thus, there is no clear and convincing evidence that the 2010 Charmin Ultra Soft's roll diameter is unchanged, just as there is no clear and convincing evidence for any of the other considerations referenced by Dr. Keller and discussed above.

Thus, all four of Dr. Keller's "considerations" that he relied on to conclude that the properties of the 2010 Charmin Ultra Soft have not changed are deficient, making the conclusion itself deficient.  On cross-examination, Dr. Keller confirmed that the proof underlying Irving's

9

attempt to use present day measurements on the 2010 Charmin Ultra Soft to substitute for measurements from the critical period is deficient.  In particular, Dr. Keller admitted that he does not actually know whether the Pa and Wc surface roughness parameters have changed:

> Q.    … And so, you don't know whether or not the claimed Pa and Wc surface properties, you actually don't know whether or not they've changed in the past 12 years do you?
>
> A.    No, because I don't have a direct comparison with the 2010.

Tr. at 904:16-21 (Keller).  This lack of certainty about the claimed Pa and Wc limitations for the 2010 Charmin Ultra Soft cannot satisfy the clear and convincing evidence standard.  *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189–90 (Fed. Cir. 2002) (affirming JMOL to patentee of no anticipation, where witness testified that she did not know with certainty whether prior art contained feature required by the claim); *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1377-78 (Fed. Cir. 2011) (reversing denial of patentee's JMOL of no anticipation where there was lack of certainty as to whether testing showed property of prior art fell within claimed range).

In *Noven Pharms., Inc. v. Amneal Pharms. LLC*, the defendant attempted to indirectly prove that a piece of prior art met claim limitations for purposes of invalidity, similar to Irving's attempt here.  C.A. No. 1-18-cv-699-LPS, 2020 WL 11191445, at *40-41 (D. Del. Sept. 4, 2020).  There, it was disputed whether any sample of the prior art product actually met several claim limitations prior to the priority date.  *Id.*  The destructive impact of tests prevented a single sample to be tested for all of several claim limitations that were in dispute.  *Id.*  To try to overcome this, the defendant attempted to substitute testing of a single sample with statistical analysis on testing of multiple samples.  *Id.* at 40.  Post-trial, the Court found defendant's statistical analysis to be deficient, and found that defendant failed to meet its burden of proof on invalidity.  *Id.* at 41.  Here, like the defendant in *Noven Pharms.*, Irving's attempt to substitute

10

data from the critical period with data from present-day measurements fails.  Dr. Keller's deficient "considerations" do not remedy this failure.

Mr. Kavalew, Irving's other expert witness, did not cure Irving's evidentiary deficiencies. Mr. Kavalew admitted that he does not "have *any expertise* on aging of tissues" and is "not a degrading expert."  Tr. at 993:16-18, 1003:1-3 (Kavalew) (emphasis added).  Although Mr. Kavalew made an ultimate, and unsupported, conclusion that the 2010 Charmin Ultra Soft has not changed, Mr. Kavalew further conceded he does not have *any expertise* in any paper physics on which to base his belief that a tissue will not degrade over a ten-year period.  Tr. at 994:11-14 (Kavalew); *see also* D.I. 195 at 20-22.  Therefore, Mr. Kavalew's non-expert testimony arguing that the properties of the 2010 Charmin Ultra Soft have not changed since the critical period should be disregarded.  *See Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1267 (Fed. Cir. 2008) (affirming JMOL of no anticipation, explaining district court properly limited defendant's expert's testimony to scope of his expertise).  Indeed, in successfully conscribing the scope of First Quality's witnesses' testimony, Irving itself argued that "[b]ecause opinions about alleged degradation or other changes in tissue properties over time require scientific or technical knowledge, no lay opinion about this issue should be permitted."  D.I. 299-15, Exhibit 12B at 1.

Further, even if Mr. Kavalew's testimony was credited, he did not offer clear and convincing evidence that the 2010 Charmin Ultra Soft satisfied the claimed surface roughness parameters during the critical period.  Mr. Kavalew argued that "if there is some kind of . . . change, you'd see the tissue being different."  Tr. at 944:11-24 (Kavalew).  This is conclusory, and is also contradicted by Dr. Keller (who, unlike Mr. Kavalew, does have a background in paper physics), who conceded that degradation of the tissue at the micron level and degradation of the chemical bonds in tissue cannot be seen with the naked eye.  Tr. at 902:16-903:13 (Keller).

Mr. Kavalew also argued that "to me, it feels like nothing's changed."  Tr. at 944:11-24

(Kavalew).  Again, this is conclusory, and again, contradicted by Dr. Keller, who explained that

"[s]ubjectivity is not appropriate" for analysis relating to degradation.  Tr. at 845:11-15 (Keller).

Mr. Kavalew further argued that a tissue does not have an expiration date or a shelf-life.  Tr. at

945:23-946:7 (Kavalew).  This testimony is not only irrelevant, but also conclusory and

generalized.   And even if true, there is no meaningful analysis as to how expiration date or shelf-

life relate to whether any claimed properties of the 2010 Charmin Ultra Soft have changed over

time.  Similarly, Mr. Kavalew made the conclusory argument that the mere fact that Procter &

Gamble had stored the 2010 Charmin Ultra Soft somehow supported his opinion that the 2010

Charmin Ultra Soft is unchanged over more than a decade.  Tr. at 946:24-947:7 (Kavalew).  As

Dr. Runge explained, and consistent with common sense, there may be many reasons why

Procter & Gamble stores samples that are unrelated to whether the samples degrade—for

example, testing for properties like fiber type and composition that do not change with

degradation.  Tr. at 1030:21-1032:23 (Runge).

Irving's present-day measurements of the surface roughness parameters of the Charmin

Ultra Soft are therefore legally insufficient to prove that the 2010 Charmin Ultra Soft satisfied

the surface roughness limitations during the critical period.

### B.  There is not legally sufficient evidence that the 2010 Charmin Ultra Soft meets the bulk softness and softness limitations

A number of the asserted claims include additional limitations on tissue properties that

Irving failed to prove are met by the 2010 Charmin Ultra Soft:  bulk softness of less than

10TS7;[3] and softness of at least 90.[4]  Irving's proof for these claim elements suffers from the

---

[3] *See* '872 patent, claim 4; '203 patent, claims 1, 3; '853 patent, claim 4.
[4] *See* '853 patent, claim 12.

same deficiency as the surface roughness limitations discussed above, i.e., Irving failed to provide clear and convincing evidence that present-day measurements for these features reflect the properties of the tissue a decade ago, during the critical period.  Further, Irving's proof for these limitations suffer from an additional deficiency—Irving did not submit any corroborating evidence that these claimed features are met.  "[C]orroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999).  Irving relied solely on Mr. Kavalew's uncorroborated oral testimony for the bulk softness and softness limitations, and that is insufficient to meet the clear and convincing standard.  *See Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 743 (Fed. Cir. 2002) ("We do not conclude that the witnesses below were not credible.  Rather, with the guidance of precedent cautioning against the reliance on oral testimony alone, we hold that the evidence of record did not provide the clear and convincing evidence necessary to invalidate the patent for prior public knowledge.").

For the bulk softness limitation, the only evidence in the record that the 2010 Charmin Ultra Soft allegedly met that limitation is the following testimony from Mr. Kavalew:

> Q.   And what were your results when you used this TS7 machine?
>
> A.   Yes.  The Charmin Ultra Soft has a bulk softness of 9.27, which is less than the 10 or less limit of the patent.  So, once again, it's within the claim range. It was before the patent was filed.  So it invalidates the claim.

Tr. at 939:11-17 (Kavalew).  Mr. Kavalew's uncorroborated testimony on the value of the 2010 Charmin Ultra Soft's bulk softness is insufficient as clear and convincing evidence.  *See Finnigan*, 180 F.3d at 1369.  Further, Mr. Kavalew's argument that "[i]t was before the patent was filed" is conclusory and unsupported.  *See Schumer*, 308 F.3d at 1315-16 ("[T]estimony is insufficient if it is merely conclusory.").

13

For the softness limitation, the only evidence in the record that the 2010 Charmin Ultra Soft allegedly met that limitation is the following testimony from Mr. Kavalew:

Q.      And what were your results?

A.      Again, the Charmin Ultra Soft mega roll, 2010, had a softness of 90.6, which is above 90 or above.  So it is within the claim limit.  So, again, invalidates Claim Number 12.

Tr. at 942:14-18 (Kavalew).  Again, this bare testimony regarding 2010 Charmin Ultra Soft's softness is uncorroborated and insufficient evidence as a matter of law.  *See Finnigan*, 180 F.3d at 1369.

Irving's failure to provide any corroborating evidence for bulk softness and softness is made worse because, to the extent there may have been any corroborating evidence, Irving improperly withheld it from discovery.  In particular, at trial, Mr. Kavalew revealed that he relied on photos of TSA testing (the Tissue Softness Analyzer testing used to determine bulk softness and softness) to allegedly verify all of the data in his report.  Tr. at 997:1-17 (Kavalew).  These photos were not presented at trial nor were they otherwise produced to First Quality in this case. *Id.*

Accordingly, there is not sufficient evidence for a jury to find that the 2010 Charmin Ultra Soft met the bulk softness and softness limitations.

### C.  First Quality intends to appeal the jury's finding of no infringement[5]

While First Quality's renewed motion for judgment as a matter of law addresses only the issue of anticipation, following the entry of a final order, First Quality intends to appeal the jury's verdict of infringement on the basis of the erroneous requirements placed on "outer

---

[5] First Quality respectfully provides this brief explanation for the sake of clarity and to avoid any potential doubt that First Quality's requested relief on anticipation is rendered moot by the jury's finding of no infringement.  First Quality understands the Court's supplemental claim construction order, D.I. 275, to be final.

surface" as captured in the Court's construction and accompanying supplemental claim construction order.  D.I. 275 at 2.

First Quality respectfully submits that the Court's construction of "outer surface," which was reached without the benefit of specific claim construction briefing, is erroneous.  As Irving agrees, the construction requires testing over embossed areas to satisfy the requirements of the "outer surface" of the tissue.  *See, e.g.*, Tr. at 814:13-20 (Keller) (stating that "to be representative [of the outer surface] you need to include embossments in your tests").[6]  But this is contrary to the intrinsic evidence.  The specification explains in detail how the characteristics of the "outer surface" are measured—i.e. by following the method in column 9 and measuring claimed surface characteristics over twenty 30 mm length scans.  *See* PTX-001 at 9:32-43.  Nothing in the specification requires the measurements to either avoid or include embossments.  Furthermore, both parties' experts appreciated that the specification is silent as to whether, or to what degree, embossments should be included in the measurement instructions included in the specification.  Tr. at 482:22-483:6 (Brown); *id*. at 821:14-17 (Keller); *see also* D.I. 197 at 4, 10-11; D.I. 210 at 8.  A claim construction that either precludes or requires measuring over embossments is inconsistent with the patent and a person of ordinary skill in the art's understanding.

Further the Court's ruling on "outer surface" incorrectly precluded a finding of infringement even though it was undisputed that portions of the accused product met the claim limitations.  *See* Tr. at 543:10-544:16, 547:7-555:13 (Runge); *id*. at 814:5-816:2, 817:18-819:20 (Keller).  The Federal Circuit has instructed that "we have never required that a claim read on the

---

[6] *See also* D.I. 394 at 1 (Irving arguing that the Court's construction "foreclose[ed] FQ's attempt to treat unembossed areas of the tissue as 'outer surfaces'" and, thus, required testing over embossed areas to satisfy the requirements of the "outer surface" of the tissue).

entirety of an accused device in order to infringe," and that "[i]f a claim reads merely on a part of an accused device, that is enough for infringement." *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1335 (Fed. Cir. 1999) (holding that the accused product, a sunglass lens, could infringe even though only a portion of the lens was alleged to practice the patented claims); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("It is well settled that an accused device that 'sometimes, but not always, embodies a claim[ ] nonetheless infringes.'") (quoting *Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995)). The Court's construction erroneously required consideration of "the outer surface of the tissue as a whole." D.I. 275 at 2. Under the correct construction, "outer surface" means "a surface on the outside of a through air dried tissue," without a requirement that "the outer surface of the tissue, *as a whole*, have roughness parameters within specified ranges," as found by the Court. *Id.* at 4 (emphasis added). Rather than describing the "surface profile" of the "tissue as a whole" as found by the Court, (*id.* at 5), Wc and Pa describe a surface profile over a specific sampling length, and that sampling length is defined in the patent. *See* PTX-0001 at 9:31-59; D.I. 81-8 at 27, 28, 35, 47; Tr. at 477:20-24 (Brown). Under the correct construction of "outer surface," a reasonable jury would necessarily conclude that Irving infringes.

## VI.   CONCLUSION

For the foregoing reasons, the Court should grant judgment as a matter of law that claims 1 and 4 of the '872 patent, claims 1 and 3 of the '203 patent, and claims 4, 12, and 13 of the '853 patent are not anticipated. In the alternative, the Court should grant a new trial regarding anticipation.

Dated:  June 21, 2022

FISH & RICHARDSON P.C.

*/s/ Warren Keith Mabey, Jr.*
Warren Keith Mabey, Jr. (No. 5775)
Joseph B. Warden (No. 6604)
Nitika Gupta Fiorella (No. 5898)
Kelly A. Del Dotto (No. 5969)
Casey M. Kraning (No. 6298)
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
Telephone: 302-652-5070
Facsimile   302-652-0607
Email:  mabey@fr.com; warden@fr.com;
fiorella@fr.com; kad@fr.com; kraning@fr.com

Edmond R. Bannon
Jeffrey C. Mok
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Telephone: (212) 765-5070
Facsimile:  (212) 258-2291
Email:  bannon@fr.com; jmok@fr.com

*Attorneys for Plaintiff*
*First Quality Tissue, LLC*